**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | | |
|---|---|---|
| KROY IP HOLDINGS, LLC, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | Civil Action No. 2:12-cv-00800-JRG-RSP |
| | § | |
| SAFEWAY, INC. et. al., | § | |
| | § | |
| *Defendant.* | § | |

| | | |
|---|---|---|
| KROY IP HOLDINGS, LLC, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | Civil Action No. 2:13-cv-00141-JRG-RSP |
| | § | |
| THE KROGER CO., | § | |
| | § | |
| *Defendant.* | § | |

## MEMORANDUM OPINION AND ORDER

On April 9, 2014, the Court held a hearing to determine the proper construction of the disputed claim terms in United States Patent No. 7,054,830. After considering the arguments made by the parties at the hearing and in the parties' claim construction briefing (Dkt. Nos. 47, 52, and 62), the Court issues this Claim Construction Memorandum and Order.

## TABLE OF CONTENTS

I.      BACKGROUND ................................................................................................. 3

II.     APPLICABLE LAW .......................................................................................... 7

III.    CONSTRUCTION OF AGREED TERMS ....................................................... 9

IV.     CONSTRUCTION OF DISPUTED TERMS ................................................... 11

        A.      "a sponsor-selected geographic location for fulfillment"................... 11

        B.      "a sponsor-selected specific award unit item"................................... 20

        C.      "sponsor-selected consumer user"..................................................... 24

        D.      "demographic … preferences" ........................................................... 28

        E.      "psychographic preferences"............................................................. 31

        F.      "provider" ......................................................................................... 36

        G.      "inventory management system"........................................................ 40

        H.      "host" and "host computer".............................................................. 45

V.      CONCLUSION................................................................................................. 48

## I.    BACKGROUND

Plaintiff brings suit alleging infringement of United States Patent No. 7,054,830 ("the '830 Patent") titled "System and Method for Incentive Programs and Award Fulfillment." The '830 Patent issued on May 30, 2006, and was filed on October 5, 1999.

The '830 Patent generally relates to a computer-based system that permits sponsors to create and administer incentive programs targeted to consumers.[1] The specification describes incentive programs as offering awards and incentives to modify behavior of individual consumers and to direct the consumers to some pre-determined action, such as purchase of products or services upon visiting a retail site, viewing advertising, testing a product, or the like. '830 Patent at 1:39–43. The specification further states that companies may use awards and incentives to increase awareness of product offerings, to attract the attention of a newly identified audience, to encourage certain behavior, to obtain information, and for other purposes. *Id.* at 1:43–48.

Regarding known systems at the time of filing, the specification states that these "systems do not offer sponsors the ability to conveniently generate incentive programs, to track participation of consumers in multiple incentive programs, or to provide for automated fulfillment of awards." *Id*. at 4:20–24. Specifically, the specification states:

> [C]urrent incentive program and award systems available over the Internet are quite limited. First, most systems are limited to a specific type of incentive program or to products and services of a single sponsoring company. Also, most such systems require a sponsoring company to use an independent contractor to code the computer software necessary for running the incentive program. Further,

---

[1] The Abstract of the '830 Patent follows:

> A method and system for providing incentive programs over a computer network is provided in which a host may provide sponsoring companies with the capability to buy prepackaged or self-built incentive programs, offer such incentive programs to consumers, provide sponsoring companies and retailers with the capability to associate prizes with incentive programs, provide sponsoring companies, retailers and consumers with convenient fulfillment of prizes, and store and manipulate databases regarding all of the foregoing.

most such systems rely on conventional mechanisms for award fulfillment, such as issuing a paper certificate to the customer by mail that is redeemable at a retail location of the sponsoring company.

*Id.* at 5:17–25. Thus, according to the specification, "[t]he present invention provides a new incentive program and award system for using a computer network, preferably the Internet, to provide consumer access to expanded incentive programs using a conventional computer, to permit sponsors to build, buy, store, modify, offer, track and administer incentive programs and to permit sponsors and retailers to offer improved award fulfillment for participants in incentive programs." *Id.* at 5:47–54.

Figure 2 provides a high-level overview of a system architecture for the disclosed system.



Fig. 2

'830 Patent at Figure 2. Referring to Figure 2, the specification describes that "a consumer computer 12, a sponsor computer 14, and a retailer computer 16 are connected by a telecommunications connection 38 over the Internet to a host computer 18." *Id.* at 10:39–43.

The specification describes that a sponsor may access the host computer (18) using a sponsor computer (14) to create an incentive program.[2] *Id.* at 17:6–21. The specification adds that the sponsor may either obtain pre-packaged incentive programs or build new incentive programs by entering the parameters of and associating awards with the sponsor's incentive programs. *Id.* at 6:13–19, 14:3–10, 14:23–46, 14:63–15:5. For example, the specification states that a set of computer programs may prompt the sponsor for the parameters needed to build a new promotion or incentive program, such as type of program, duration of the promotion, target participants, associated awards, conditions to obtain awards, etc. *Id.* at Figures 11–12, 30:47–53, 31:55–32:20, 35:3–22. The specification states that the host computer then creates the underlying software code to implement the sponsor designed incentive program, creates HTML pages with appropriate graphics, text and fields for the end customer, and stores records and other information in appropriate databases. *Id.* at 32:21–24, 33:12–52.

After the incentive program is created, the specification states that consumers may participate in the incentive programs by using a consumer computer (12) to interact with a consumer section of web site hosted on a server of a host computer (18).[3] *Id.* at 12:18–33. The specification notes that the incentive programs could include a variety of games, or,

---

[2] The specification defines the term "host" as "any individual or company who wishes to provide a system for permitting sponsoring companies to offer incentive programs to consumers, employees, suppliers, partners and the like of the individual or company, and for creation of databases of retail, catalog, sponsor and other items that permit automated fulfillment of specific items listed in computer inventory systems of retailers at a retail location." '830 Patent at 8:10–17. The specification defines the term "sponsor" as "any individual or company that wishes to offer an incentive program or promotion." *Id.* at 7:51–53.

[3] The specification defines the term "consumer" as "any individual or user who wishes to participate in awards or incentive programs offered by sponsors. Consumers may be third parties, such as partners or suppliers, may be employees of sponsors, or may be customers of the sponsor's merchandise or the merchandise of third parties; thus, the present invention is intended to encompass systems and methods by which a company offers incentive programs to individuals within its organization, such as via a computer intranet, as well as systems and methods for providing incentive programs to third parties via external computer networks." 830 Patent at 7:65–8:9.

alternatively, may include entering data, completing surveys, clicking on one or more icons in a pre-determined manner, or other "win eligible" activities, such as answering questions or participating in a customer loyalty program. *Id.* at 13:40–48, 30:57–31:3. The specification also describes that the consumer may be provided with an electronic card for storing information associated with the consumer for use when the consumer redeems an award at a retail point-of-sale device. *Id.* at 6:46–51, 13:25–39, 22:17–31, 42:4–15.

The specification further states that the disclosed system permits sponsors to target incentive programs and awards to categories of consumers based on consumer demographic and psychographic preferences. *Id.* at 42:43–44. The specification adds that this information may be obtained during consumer registration, from tracking consumer participation in incentive programs, and/or from consumer responses to specific inquiries. *Id.* at Figures 16–17, 13:3–25, 15:16–23, 18:43–54, 31:37–40, 41:62–67. The specification also states that the sponsor may also provide parameters that control award fulfillment and redemption, which are stored in a database. *Id.* at 6:13–19, 20:13–16, 21:58–63, 41:11–20, 46:42–56.

Finally, the specification describes that retailers may participate in the fulfillment or delivery of awards to consumers.[4] *Id.* at 6:20–23, 7:54–56. The specification describes that a retailer can access the system via a retailer computer (16) to make retail items in their inventory available to sponsors for association with incentive programs as awards. *Id.* at 11:33–52, 15:31–47. The specification further provides that the "system may further include an electronic data interchange 126 from the retailer computer 16 to a retailer inventory system 212, which permits access between the retailer components and the host computer 18 over the Internet." *Id.* at 10:47–50. The specification also states that an entity may have the dual roles of both retailer and

---

[4] The specification defines the term "retailer" as "any individual or company that wishes to provide awards and prizes to be associated with incentive programs." '830 Patent at 7:54–64.

sponsor of an incentive program. *Id.* at 21:15–17.

Claim 19 is asserted in this case and recites the following elements (disputed terms in italics):

> 19. A method for providing an incentive programs and automating award fulfillment, comprising:
>     providing a *host computer*;
>     providing an incentive program on the *host computer*, wherein a participant may participate in said incentive program;
>     providing a database of awards on the *host computer* associated with the incentive program; and
>     providing automated award fulfillment of said awards to participants, including providing communication with an *inventory management system* associated with each of a plurality of *providers* wherein said automated award fulfillment comprises
>     providing sponsor-selected fulfillment comprising
>         providing a *sponsor-selected specific award unit item*,
>         providing said *sponsor-selected specific award unit item* tailored according to *demographic* and *psychographic preferences* of a *sponsor-selected consumer user*, and
>         providing a *sponsor-selected geographic location for fulfillment*.

## II.     APPLICABLE LAW

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (quoting *Innova/Pure Water Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). To determine the meaning of the claims, courts start by considering the intrinsic evidence. *See id.* at 1313. *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 861 (Fed. Cir. 2004); *Bell Atl. Network Servs., Inc. v. Covad Commc'ns Group, Inc.*, 262 F.3d 1258, 1267 (Fed. Cir. 2001). The intrinsic evidence includes the claims themselves, the specification, and the prosecution history. *See Phillips*, 415 F.3d at 1314; *C.R.*

*Bard, Inc.*, 388 F.3d at 861.  Courts give claim terms their ordinary and accustomed meaning as understood by one of ordinary skill in the art at the time of the invention in the context of the entire patent.  *Phillips*, 415 F.3d at 1312–13; *Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361, 1368 (Fed. Cir. 2003).

The claims themselves provide substantial guidance in determining the meaning of particular claim terms.  *Phillips*, 415 F.3d at 1314.  First, a term's context in the asserted claim can be very instructive.  *Id*.  Other asserted or unasserted claims can also aid in determining the claim's meaning because claim terms are typically used consistently throughout the patent.  *Id*.  Differences among the claim terms can also assist in understanding a term's meaning.  *Id*.  For example, when a dependent claim adds a limitation to an independent claim, it is presumed that the independent claim does not include the limitation.  *Id*. at 1314–15.

"[C]laims 'must be read in view of the specification, of which they are a part.'"  *Id*. (quoting *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc)).  "[T]he specification 'is always highly relevant to the claim construction analysis.  Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'"  *Id*. (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)); *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002).  This is true because a patentee may define his own terms, give a claim term a different meaning than the term would otherwise possess, or disclaim or disavow the claim scope.  *Phillips*, 415 F.3d at 1316.  In these situations, the inventor's lexicography governs.  *Id*.  The specification may also resolve ambiguous claim terms "where the ordinary and accustomed meaning of the words used in the claims lack sufficient clarity to permit the scope of the claim to be ascertained from the words alone." *Teleflex, Inc.*, 299 F.3d at 1325.  But, "'[a]lthough the specification may aid the court in interpreting the meaning of

disputed claim language, particular embodiments and examples appearing in the specification will not generally be read into the claims.'" *Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1187 (Fed. Cir. 1998) (quoting *Constant v. Advanced Micro-Devices, Inc.*, 848 F.2d 1560, 1571 (Fed. Cir. 1988)); *see also Phillips*, 415 F.3d at 1323. The prosecution history is another tool to supply the proper context for claim construction because a patent applicant may also define a term in prosecuting the patent. *Home Diagnostics, Inc., v. Lifescan, Inc.*, 381 F.3d 1352, 1356 (Fed. Cir. 2004) ("As in the case of the specification, a patent applicant may define a term in prosecuting a patent.").

Although extrinsic evidence can be useful, it is "'less significant than the intrinsic record in determining the legally operative meaning of claim language.'" *Phillips*, 415 F.3d at 1317 (quoting *C.R. Bard, Inc.*, 388 F.3d at 862). Technical dictionaries and treatises may help a court understand the underlying technology and the manner in which one skilled in the art might use claim terms, but technical dictionaries and treatises may provide definitions that are too broad or may not be indicative of how the term is used in the patent. *Id*. at 1318. Similarly, expert testimony may aid a court in understanding the underlying technology and determining the particular meaning of a term in the pertinent field, but an expert's conclusory, unsupported assertions as to a term's definition are entirely unhelpful to a court. *Id*. Generally, extrinsic evidence is "less reliable than the patent and its prosecution history in determining how to read claim terms." *Id*.

### III.    CONSTRUCTION OF AGREED TERMS

The parties have agreed to the construction of the following terms:

| Claim Term/Phrase | Agreed Construction |
|---|---|
| "sponsor"[5] | "any individual or company that wishes to offer an |

---

[5]  Consistent with the parties' agreed construction, the specification defines the term "sponsor"

| | incentive program or promotion" |
|---|---|
| "plurality of providers"[6] | "two or more providers" |
| "plurality of sponsors" | "two or more sponsors" |

Joint Claim Construction Chart, Dkt. No. 41 at 1–2.  In view of the parties' agreements on the proper construction of each of the identified terms, the Court hereby **ADOPTS AND APPROVES** the parties' agreed constructions.  The parties also agree that that the terms "first database," "sponsor-selected fulfillment," and "geographic proximity" do not require construction. (Dkt. Nos. 52 at 33; 62 at 4 n.1.)  Pursuant to the parties' agreement, the Court will not construe these terms.

During the hearing, the Court provided the parties with proposed constructions for the disputed terms/phrases.  The parties agreed to the Court's proposed construction for the following terms:

| Claim Term/Phrase | Agreed Construction |
|---|---|
| "automated award fulfillment" | No construction necessary |
| "associated with each" | No construction necessary |
| "incentive program" | "any program for creating incentives" |
| "award" | "all types of incentives, including merchandise, coupons, points, cash, services and other forms incentives" |

In view of the parties' agreement on the proper construction of each of the identified terms, the Court hereby **ADOPTS AND APPROVES** the parties' agreed constructions.

as "any individual or company that wishes to offer an incentive program or promotion." '830 Patent at 7:51–53.

[6]  The term "provider" as used within the phrase "plurality of providers" remains in dispute. (Dkt. No. 41 at 1.)

## IV.   CONSTRUCTION OF DISPUTED TERMS

The parties' dispute focuses on the meaning and scope of nine terms/phrases in the '830 patent.

### A.   *"a sponsor-selected geographic location for fulfillment"*

| Disputed Term | Claim | Plaintiff's Proposal | Defendants' Proposal |
|---|---|---|---|
| "a sponsor-selected geographic location for fulfillment" | 1, 6, 11, 19, 26-28 | No construction necessary.<br><br>If construed, the term means: "one or more places selected by a sponsor for fulfillment" | "specific store where award can be redeemed selected by the sponsor (not the consumer)" |

The parties dispute whether the phrase "a sponsor-selected geographic location for fulfillment" requires construction.[7]  Plaintiff contends that the disputed phrase is not ambiguous in the context of the claims and therefore does not require construction. (Dkt. No. 47 at 34.)  In the alternative, Plaintiff contends that the disputed phrase has a broad and easily understandable meaning derived from the ordinary meanings of the chosen words "geographic" and "location." (Dkt. No. 47 at 34.)  Plaintiff argues that the well-established meaning of "geographic location" refers to and includes any designated place, and is not limited to a "specific store." (Dkt. No. 47 at 35.)  Plaintiff references dictionary definitions for the terms "geographic" and "location," and concludes that the term "geographic location" applies to any identifiable place, region, territory, area, etc. within the greater earth. (Dkt. No. 47 at 35–36.)  Plaintiff argues that a store location is one example of a geographic location, but not the only type. (Dkt. No. 47 at 36.)  Plaintiff notes

---

[7]  Defendants propose construing both the shorter phrase "geographic location for fulfillment" and the longer phrase "sponsor-selected geographic location for fulfillment."  Defendants did not provide a persuasive reason for construing these phrases separately. (Dkt. No. 52 at 9.)  Moreover, Defendants' proposed construction for "geographic location for fulfillment" is included in their proposed construction for the phrase "sponsor-selected geographic location for fulfillment."  Accordingly, the Court will construe the longer phrase "sponsor-selected geographic location for fulfillment."

that the claims do not recite providing "a specific store" for fulfillment. (Dkt. No. 47 at 36.)

Plaintiff further argues that each of the claims at issue recite the open-ended transitional phrase "comprising," and therefore the presumption that the article "a" means "one or more" applies. (Dkt. No. 47 at 36.)   Plaintiff contends that nothing in the claims, specification or prosecution history file requires that the invention must be implemented by the sponsor selecting a single store for redemption. (Dkt. No. 47 at 36.)   Instead, Plaintiff contends that the specification expressly describes the designation of multiple locations. (Dkt. No. 47 at 37.) Plaintiff also argues that claims 4 and 9 indicate that the sponsor-selected geographic location is not confined to being a store location. (Dkt. No. 47 at 37–38.)   Finally, Plaintiff contends that neither the patent specification nor its prosecution history supports Defendants' construction of the disputed phrase. (Dkt. No. 47 at 38–40.)   Instead, Plaintiff argues that the implementation where the consumer is directed to a particular store to redeem an award is only one possible embodiment, and that the specification contains no limiting language requiring that a sponsor must always designate a single store for redemption. (Dkt. No. 47 at 38–40.)   Plaintiff further contends that the prosecution history supports its construction. (Dkt. No. 47 at 40.)

Defendants respond that their construction for the term "geographic location" finds support throughout the intrinsic record. (Dkt. No. 52 at 9.)   Defendants contend that the specification expressly discloses that the invention makes use of databases to identify the nearest retail location for fulfillment, which means that the location must be a specific store and not a geographic location. (Dkt. No. 52 at 9–10.)   Defendants also contend that the patentee's argument to the Patent Office relinquished any potential claim construction that would cover a retailer limiting incentives based on a geographic region. (Dkt. No. 52 at 10–11.)   Defendants further argue that Plaintiff improperly relies on dictionary definitions to overcome Defendants'

arguments. (Dkt. No. 52 at 12.) Defendants also argue that the strong presumption that the article "a" means "one or more" is overcome by the prosecution history. (Dkt. No. 52 at 13.) Defendants also suggest that arguments made in a foreign counterpart application are relevant evidence and should limit the claims to a specific store. (Dkt. No. 52 at 13–14.)

Regarding the term "sponsor-selected," Defendants contend that the patentee disclaimed a consumer selecting the location for fulfillment. (Dkt. No. 52 at 15.) In making this argument, Defendants ask the Court to find not only that the sponsor must select at least one specific location for fulfillment, but that the sponsor must only select a single location, and that the claim language cannot be met if a sponsor selects additional geographic locations. Defendants first argue that the claims state "sponsor-selected" and that the only logical inference is that the geographic location for fulfillment is not consumer selected. (Dkt. No. 52 at 15.) Defendants further argue that the patentee disclaimed consumer selection of a fulfillment location by arguing to the Patent Office that the sponsor, and not the consumer, selects the geographic location for fulfillment. (Dkt. No. 52 at 15.) Defendants also argue that the patentee disclaimed consumer selection of a location for fulfillment in arguments before the European Patent Office. (Dkt. No. 52 at 15–16.)

Plaintiff responds that Defendants incorrectly argue that the claims should be limited to an exemplary embodiment. (Dkt. No. 62 at 11.) Plaintiff contends that this embodiment presupposes the sponsor selecting multiple locations for award redemption, otherwise there would be no purpose in the host determining the nearest location when an award is won. (Dkt. No. 62 at 11.) Plaintiff further argues that none of the claims recite the additional steps of determining the nearest retail location or instructing the consumer user of that location. (Dkt. No. 62 at 11.) Thus, according to Plaintiff, the passages referenced by Defendants have no bearing

on the meaning of "a sponsor-selected geographic location" in the claims at issue. (Dkt. No. 62 at 11.)

Plaintiff also argues that in view of the broad disclosure in the specification the article "a" in "a sponsor-selected geographic location for fulfillment" invokes a strong legal presumption that the plural meaning "one or more" was not overcome. (Dkt. No. 62 at 11.) Plaintiff further argues that the statements made during prosecution were not a "clear and unmistakable disavowal" of scope. (Dkt. No. 62 at 11.) Plaintiff notes that the patentee did not amend the claims to require that the sponsor designate fulfillment at a specific store. (Dkt. No. 62 at 12.) Plaintiff also contends that Defendants' portrayal of the Scroggie reference is incomplete and misleading because the patentee emphasized that the difference was that the sponsor designated the location of award fulfillment. (Dkt. No. 62 at 12.) Plaintiff further contends that Defendants' reliance on proceedings in the European Patent Office is legally improper and fails to evidence a disclaimer of claim scope. (Dkt. No. 62 at 12–13.) Finally, regarding the term "sponsor-selected," Plaintiff argues that Defendants have not shown an ambiguity in "sponsor-selected" or that any disclaimer occurred necessitating the construction "selected by the sponsor (not the consumer)."

For the following reasons, the Court construes **"a sponsor-selected geographic location for fulfillment"** to mean **"at least one specific geographic location selected by a sponsor for fulfillment."**

### 1. The Claim Language

The Court first turns to the language of the claims, as it provides "substantial guidance as to the meaning of particular claim terms." *Phillips*, 415 F.3d at 1313 (citing *Vitronics*, 90 F.3d at 1582). The phrase "a sponsor-selected geographic location for fulfillment" appears in claims 1,

6, 11, 19, and 26–28.  The Court finds that the phrase is used consistently in the claims and is intended to have the same meaning in each claim.  Regarding the term "sponsor-selected," the Court finds that the plain language of the claims makes clear that the "geographic location" is "selected by a sponsor," and not the consumer.  Independent claims 1 and 19 reference both a "sponsor" and a "consumer."   In further describing the claimed "geographic location" as "sponsor-selected," the claims recite that the location is selected by the sponsor and not the consumer.

Regarding the phrase "geographic location," the Court notes that none of the claims require or further specify that this location is limited to a "specific store" as Defendants propose. Indeed, the claims use the open-ended transitional phrase "comprising" and recite "a geographic location." *KCJ Corp. v. Kinetic Concepts, Inc.*, 223 F.3d 1351, 1356 (Fed. Cir. 2000) ("This court has repeatedly emphasized that an indefinite article 'a' or 'an' in patent parlance carries the meaning of 'one or more' in open-ended claims containing the transitional phrase 'comprising.'").  Likewise, claim 9, which depends indirectly from independent claim 6, recites fulfillment options including "receiving fulfillment at a sponsor designated geographic location; receiving online fulfillment; receiving offline fulfillment; receiving fulfillment at a merchant; receiving fulfillment at a retailer; or receiving fulfillment at point of sale (POS)."   This demonstrates that a person of ordinary skill in the art would understand that a "sponsor-selected geographic location" is broader than a "specific store," and may include a merchant, a retailer, or a POS.  Accordingly, the claim language does not support Defendants' construction for the term "geographic location."  However, although the claims are not limited to a "specific store," the claims do require at least one specific geographic location, whether it be a merchant's location, a retailer's location, or a POS.  The Court now turns to the remaining intrinsic evidence.

## 2.  The Intrinsic Evidence

In addition to the claims, the remaining intrinsic evidence in this case indicates that the term "geographic location" should not be limited to a "specific store."   The specification describes an exemplary embodiment as follows:

> Next, at a step 430, the award database 204 is updated to reflect the association of the prize with the particular consumer who has won the prize. Next, at a step 432, the award database 204 may be queried to determine the available *geographic locations of prizes* of the type won by the consumer.
>
> Next at a step 434, the host computer 18 executes an algorithm that selects the appropriate fulfillment option for the prize. In particular, by comparing the geographic information of the consumer in the consumer database 200 and the information in the award database 204, the host computer 18 identifies the nearest retail location for fulfillment of the prize or, if no location is suitable, the prize may be mailed to the consumer.

'830 Patent at 21:58–22:4 (emphasis added).   Defendants contend that the "nearest" retail location implies one specific location because multiple locations cannot each be "nearest." (Dkt. No. 52 at 9.)   Although this may be true for this exemplary embodiment, the Court finds that the claims are not limited to this exemplary embodiment. *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 906 (Fed. Cir. 2004) ("[T]his court has expressly rejected the contention that if a patent describes only a single embodiment, the claims of the patent must be construed as being limited to that embodiment.").

Moreover, Defendants do not address the fact that the specification indicates that there can be multiple "locations" of the prizes, and that the locations of the prizes are not limited to a specific store.   For example, the specification states that "the award database 204 may be queried to determine the available *geographic locations of prizes* of the type won by the consumer." '830 Patent at 21:62–63 (emphasis added).   Similarly, the specification states that "manufacturers could launch promotions across *multiple store networks* with a single fulfillment card." '830 Patent at 42:62–63 (emphasis added).   Thus, the specification contemplates prizes

being located at multiple stores and not a single "specific store" as Defendants propose. Indeed, Defendants concede that "the specification does not expressly state that the sponsor must designate a single store for redemption." (Dkt. No. 52 at 14.) Thus, the Court concludes that a person of ordinary skill in the art would understand that the specification indicates that the recited "geographic location" includes at least one location.

Defendants next argue that the claims should be limited to a "specific store" based on arguments made during prosecution. To distinguish the prior art relied on by the Patent Office, the applicant stated the following:

> Automated award fulfillment, according to the present invention, ***includes sponsor designated or selected redemption*** whereby the sponsor of the award may … designate the location of the redemption (see Specification at page 95, line 20, for example). The selection can also include a specific consumer user selected by the sponsor which can, e.g., be instructed to go to a store identified as having the award by the inventory management system to pick up the award unit (See for example page 97, line 14-17). The award unit can then be allocated from inventory to ensure availability upon a visit by the specific consumer user. For example, the location may include the geographical location of the retailer, merchant, or point of sale (POS) (See for example page 96, lines 2-20).

Dkt. No. 53 at 40 (Jan. 25, 2002 Reply to OA) (emphasis in original). Defendants contend that this argument, as well as the restatement of the claim language "sponsor-selected geographic location for fulfillment" in a later response, constitute a clear disclaimer. (Dkt. No. 52 at 11.) The Court disagrees that this is a "clear and unmistakable disavowal" of scope. *Purdue Pharma LP v. Endo Pharm. Inc.*, 438 F. 3d 1123, 1136 (Fed. Cir. 2006). First, in the January 25, 2002 Response, the patentee did not argue that the claims were distinguishable because the geographic location was located to a "specific store." Instead, the patentee argued that "the location may include the geographical location of the retailer, merchant, or point of sale (POS)." (Dkt. No. 53 at 40.) Thus, the patentee indicated that the geographic location could be multiple locations and did not limit the claims to a "specific store." Moreover, the prosecution

history makes clear that the patentee distinguished the claims based on a sponsor selecting the location for fulfillment, and not the consumer. Specifically, in distinguishing the Scroogie reference the patentee stated:

> First, the present invention allows far more flexibility for the **sponsor** of the incentive program to design his award fulfillment program, via various **selections**, see claims as amended. Second, the present invention actually contradicts Scroogie in that the purpose of Scroogie is to provide convenience to the consumers, while the object of the present invention is to provide convenience to the **sponsor**.

Dkt. 53 at 108–109 (Oct. 23, 2003 Reply to OA) (emphasis in original). Thus, the patentee's disclaimer relates to the "sponsor-selected" term, and not the "geographic location" term of this phrase. This is consistent with the claim amendments presented with these arguments and the plain language of the issued claims. Similarly, the mere fact that a consumer might, for example, select one of two sponsor-selected specific geographic locations for redemption does not run contrary to either the claim language or goal evinced during prosuection of "provid[ing] convenience to the sponsor."

Finally, Defendants argue that an argument made during prosecution of a foreign counterpart application is relevant evidence that should be considered by the Court. (Dkt. No. 52 at 13.) First, the Federal Circuit has noted "that 'the varying legal and procedural requirements for obtaining patent protection in foreign countries might render consideration of certain types of representations inappropriate' for consideration in a claim construction analysis of a United States counterpart." *TI Grp. Auto. Sys. (N. Am.), Inc. v. VDO N. Am., L.L.C.*, 375 F.3d 1126, 1136 (Fed. Cir. 2004) (quoting *Caterpillar Tractor Co. v. Berco, S.p.A.*, 714 F.2d 1110, 1116 (Fed. Cir. 1983)). Second, even assuming that the foreign patentability statements are relevant to the Court's claim construction analysis, the Court finds the evidence offered by Defendants unpersuasive. The foreign passages are not absolute and use permissive

language that the invention "can" direct a consumer to pick up an award at a specific geographic location or that it "allows" for this.

Moreover, the patentee argued that the claims in the foreign application were distinguishable because the prior art is "<u>customer-oriented</u>, unlike the present invention, which is <u>provider-oriented</u>." (Dkt. No. 58 at 16) (emphasis in original). Similar to the United States prosecution history, the patentee focused on the sponsor selection versus the customer selection to distinguish the claims. Accordingly, the Court concludes that the "geographic location" should not be limited to a "specific store," but that the *sponsor* must select at least one specific geographic location for fulfillment.

### 3. The Extrinsic Evidence

Plaintiff references dictionary definitions for the terms "geographic" and "location," and concludes that the term "geographic location" applies to any identifiable place, region, territory, area, etc. within the greater earth. (Dkt. No. 47 at 35–36.) Defendants disagree and contend that it would be legal error to rely on dictionary definitions presented by Plaintiff given the intrinsic record. (Dkt. No. 52 at 12.) As discussed above, the intrinsic record does not limit the term "geographic location" to a "specific store." Notwithstanding, the Court finds that the term "geographic location" is unambiguous, is easily understandable by a jury, and requires no construction. Moreover, the Court has resolved the dispute regarding the proper scope of "geographic location" by finding that it is not limited to a "specific store," but does require at least one specific geographic location.

### 4. Court's Construction

In light of the intrinsic evidence, the Court construes **"a sponsor-selected geographic location for fulfillment"** to mean **"at least one specific geographic location selected by a**

**sponsor for fulfillment."**

### B. *"a sponsor-selected specific award unit item"*

| Disputed Term | Claim | Plaintiff's Proposal | Defendants' Proposal |
|---|---|---|---|
| "a sponsor-selected specific award unit item" | 1, 6, 11 19, 26-28 | "a specific award and corresponding identifying and/or classifying information selected by the sponsor to be associated with a particular incentive program" | "the specific item available as an award from the inventory management system selected by the sponsor (not the consumer)" |

The parties dispute whether the phrase "a sponsor-selected specific award unit item" should be construed as "a specific award and corresponding identifying and/or classifying information," as Plaintiff proposes, or as "the specific item available as an award from the inventory management system," as Defendants propose.[8] The parties also dispute whether the construction should explicitly state that the consumer does not select the specific item available as an award.

Plaintiff argues that the specification provides a definition for "award unit" and describes how the disclosed system permits a sponsor to select award units for its incentive programs. (Dkt. No. 47 at 29.) Plaintiff further argues that Defendants' construction conflates the disputed phrase with the term "award" despite the specification description that an award unit is not just an award. (Dkt. No. 47 at 29.) Finally, Plaintiff argues that the claims do not mention a sponsor selecting an inventory management system. (Dkt. 47 at 29–30.)

Defendants respond that the intrinsic evidence gives "award unit item" a specific

---

[8] Defendants propose construing both the shorter phrase "specific award unit item" and the longer phrase "a sponsor-selected specific award unit item." Defendants did not provide a persuasive reason for construing these phrases separately. (Dkt. No. 52 at 16) Moreover, Defendants' proposed construction for "specific award unit item" is included in their proposed construction for the phrase "a sponsor-selected specific award unit item." Accordingly, the Court will construe the longer phrase "a sponsor-selected specific award unit item."

meaning and that the terms "awards," "award units," and "award unit items" must have progressively narrower definitions, with "award" being the broadest term. (Dkt. No. 52 at 16.) Defendants contend that an award unit "item" must be an item that is selected as an award unit. (Dkt. No. 52 at 17.) Defendants argue that Plaintiff's construction should be rejected because it reads the word "item" out of the claims to broaden the scope of the claims. (Dkt. No. 52 at 17.) Defendants argue that this is a problem for Plaintiff because it accuses Defendants' online coupon systems of infringement and coupons are not items in a retailer's inventory. (Dkt. No. 52 at 17.) Defendants further argue that the patentee disclaimed a consumer selecting the specific award unit item during prosecution. (Dkt. No. 52 at 18–19.)

Plaintiff responds that Defendants incorrectly abandon the explicit definitions provided in the specification because of the word "item" in the claim. (Dkt. No. 62 at 8.) Plaintiff contends that the word "item" simply implies a specific instance of a "sponsor-selected specific award unit." (Dkt. No. 62 at 8.) Plaintiff states that it has no objection to modifying its construction to start with: "a specific award item . . ." because the word "item" does not affect the scope of this claim limitation. (Dkt. No. 62 at 8.) Plaintiff further contends that Defendants' focus on "retail items" in the specification is misplaced because "retail items" are only one type of "item" that can be associated with the incentive programs of the invention via a corresponding "award unit item." (Dkt. No. 62 at 8.) Plaintiff also argues that Defendants' assertion that the resulting claim scope would exclude awards in the form of coupons is incorrect because the specification makes clear that the invention applies to coupon awards. (Dkt. No. 62 at 8.) Finally, Plaintiff contends that construing "sponsor-selected" to mean "selected by the sponsor (not the consumer)" would be overkill. (Dkt. No. 62 at 9.)

For the following reasons, the Court construes **"a sponsor-selected specific award unit**

**item"** to mean **"a specific award item and all of the corresponding identifying or classifying information selected by a sponsor."**

### 1. The Claim Language

The phrase "a sponsor-selected specific award unit item" appears in claims 1, 6, 11, 19 and 26-28. The Court finds that the phrase is used consistently in the claims and is intended to have the same meaning in each claim. The Court further finds that the term "award" and "award unit item" are not used interchangeably. For example, dependent claim 4 recites that the "automated award fulfillment application program is adapted to allow designation or redemption of an *award*." '830 Patent at Claim 4 (emphasis added). Whereas independent claim 1 recites "code adapted to provide a *sponsor-selected specific award unit item*." '830 Patent at Claim 1 (emphasis added). The intended difference between "award" and "award unit" is further described in the specification. Accordingly, the Court will now turn to the remaining intrinsic evidence.

### 2. The Intrinsic Evidence

The specification defines an "award" and an "award unit," and further clarifies how the terms are related. First, the specification states:

> The term 'prize' and the term 'award' should be understood to be synonymous and to encompass all types of incentives, including merchandise, coupons, points, cash, services and other forms of incentives.

'830 Patent at 7:44–47. Thus, contrary to Defendants' contention, the specification explicitly states that an "award" encompasses all types of incentives, including coupons. The specification then describes an "award unit" as follows:

> The items stored in the award database may include the method of fulfillment (i.e. by a third party, by a sponsor or by a retailer), identification numbers of the item, which may be accomplished by utilizing the retailer's inventory identifying data, a description of the item and the number of items available. In the case of retailer redemption, additional items could include a number assigned to the merchant,

the merchant's store number, and the geographic location of the award or reward items, which may be sorted by zip code or area code. *The prize or reward and all of the corresponding identifying or classifying information can be characterized as an award unit. An understanding of the award unit is important, because consumers may win award units, not just awards.*

'830 Patent at 41:11–24 (emphasis added). The specification further describes permitting a sponsor to select award units for its incentive program:

> As described above, via an interface (and after selection or design of an incentive program) a sponsor could select an award unit to be associated with a particular sponsor incentive program, and the subsequent association will be stored in the sponsor database 202. . . . The sponsor could also input its own awards and 40 associated information (description, fulfillment method, etc.) in order to define the award units to be associated with the sponsor's incentive program or programs.

'830 Patent at 41:33–43. Given this description, the Court finds that a person of ordinary skill in the art would understand a "specific award unit item" to mean a "specific award item and all of the corresponding identifying or classifying information." Contrary to Defendants' suggestion, this does not read the word "item" out of the claims because it requires both a specific award item and all of the corresponding identifying or classifying information. (Dkt. No. 52 at 17.) Moreover, the Court disagrees with Defendants that one sentence in the specification relating to retail items requires construing the phrase as "items available as an award from the inventory management system." Dkt. No. 52 at 17 (Citing '830 Patent at 6:20-23). "Retail items" are one type of "item" that can be associated with the claimed incentive programs via a corresponding "award unit item." Accordingly, the Court finds that a "specific award unit item" to mean a "specific award item and all of the corresponding identifying or classifying information."

Regarding the term "sponsor-selected," the Court agrees with Defendants that the patentee disclaimed a consumer selecting the specific award unit item during prosecution. To distinguish the claims from the prior art the patentee stated the following:

> Kanter's system does not allow a sponsor to designate an item to be redeemed.

Kanter has <u>no</u> knowledge of merchant provider's inventory data, let alone real time knowledge and allocation of inventory. Kanter only allows a designation of a redemption location and a general amount of redemption. Kanter, also teaches ***consumer user*** selection of an item to be redeemed in exchange for accumulated credit value.

…

Automated award fulfillment, according to the present invention, ***includes sponsor designated or selected redemption*** whereby the sponsor of the award may select or determine what award unit (see Specification at page 93, line 9, for example) will be provided to the consumer user, by communicating with an ***inventory management system of multiple providers*** and may designate the location of the redemption (see Specification at page 95, line 20, for example).

Dkt. 53 at 167–168 (Aug. 26, 2002 Reply to OA) (emphasis in original). With this argument, the patentee focused on the sponsor selection aspect to distinguish the claims from the prior art. Thus, the Court finds that the patentee clearly limited the scope of the claims to sponsor-selected award unit items. Thus, the claimed "award unit item" must be selected by a sponsor and not the consumer.

### 3. Court's Construction

In light of the intrinsic and extrinsic evidence, the Court construes **"a sponsor-selected specific award unit item"** to mean **"a specific award item and all of the corresponding identifying or classifying information selected by a sponsor."**

### C. *"sponsor-selected consumer user"*

| Disputed Term | Claim | Plaintiff's Proposal | Defendants' Proposal |
|---|---|---|---|
| "sponsor-selected consumer user" | 1, 6, 11, 14, 19, 26-28, 32, 34 | No construction necessary.<br><br>If construed, the term means: "one or more consumer users selected by a sponsor." | "a particular consumer selected from a group of consumers by the sponsor based on demographic and psychographic criteria" |

The parties dispute whether the phrase "sponsor-selected consumer user" requires construction. Plaintiff contends that it does not require construction, and in the alternative, that it

should be construed as "one or more consumer users selected by a sponsor." Defendants contend that the phrase should be construed as "a particular consumer selected from a group of consumers by the sponsor based on demographic and psychographic criteria." Thus, the dispute is focused on whether the phrase relates to "one or more consumer users," as Plaintiff proposes, or "a particular consumer," as Defendants propose. The parties also dispute if the consumer is selected based on demographic and psychographic criteria, as Defendants propose.

Plaintiff contends that the only aspect of the phrase that potentially requires clarification is the article "a," which means "one or more." (Dkt. No. 47 at 33.) Plaintiff argues that the claims indicate that a specific award unit item is both (1) selected by a sponsor and (2) tailored to demographic and psychographic preferences of a sponsor-selected consumer user. (Dkt. No. 47 at 33.) Plaintiff contends that Defendants' proposal would add an unwarranted limitation because the claims do not say that the consumer user is selected by a sponsor based on demographic and psychographic criteria. (Dkt. No. 47 at 33.)

Defendants respond that the patentee expressly represented to the Patent Office that the consumer user is selected by a sponsor based on demographic and psychographic criteria. (Dkt. No. 52 at 19.) Thus, Defendants contend that their construction should be adopted because it excludes from the claim a broader interpretation expressly disclaimed by the patentee during prosecution. (Dkt. No. 52 at 20.)

Plaintiff responds that the claims recite "a . . . consumer user" and do not recite the singular phrase "a particular consumer," or the additional limitation of selecting a particular consumer from a group based on demographic and psychographic criteria. (Dkt. No. 62 at 10.) Plaintiff further argues that the patentee's statements were made in response to an indefiniteness rejection based under § 112 ¶ 2, and that the patentee responded by defending the broad claim

scope. (Dkt. No. 62 at 10.)

For the following reasons, the Court construes **"sponsor-selected consumer user"** to mean **"at least one consumer user selected by a sponsor"**

### 1. The Claim Language

The phrase "sponsor-selected consumer user" appears in claims 1, 6, 11, 14, 19, 26-28, 32, and 34. The Court finds that the phrase is used consistently in the claims and is intended to have the same meaning in each claim. The Court also finds that the claim language provides guidance on the meaning of the disputed phrase. Specifically, all of the independent claims state that the "sponsor-selected specific award unit [is] … tailored to the … preferences of a sponsor-selected consumer user." Because the claims use the open-ended transitional phrase "comprising" and recite "a sponsor-selected consumer user," the claims are not limited to a "particular consumer," but instead require "at least one consumer." Likewise, the claim language does not require that the selection of the consumer be "based on demographic and psychographic criteria." Indeed, the claim language only requires that the specific award unit to be tailored to the "preferences" of a consumer user. The Court will now turn to the remaining intrinsic evidence.

### 2. The Intrinsic Evidence

Defendants do not contend that the specification provides examples where the consumer is selected by a sponsor "based on demographic and psychographic criteria." Instead, the specification provides that a sponsor can obtain this information "or other information relevant to the participation of consumers in sponsor's incentive programs." '830 Patent at 15:21–22. Consistent with the claim language, the specification further states that one benefit of the fulfillment procedure is that "[s]ponsors are able to target awards for giveaway by

demographic preferences or geography." '830 Patent at 42:43-44.  In other words, the claims recite that the awards are "tailored to the … preferences of a sponsor-selected consumer user," and not that the consumer is selected based on his preferences.

To support their construction, Defendants point to a single sentence from the prosecution history and contend that it provides a clear disclaimer.  Specifically, the patentee stated the following in response to an indefiniteness rejection:

> The Examiner proceeds to reject the claims under 112 second paragraph as allegedly being indefinite for failing to particularly point out and distinctly claim the invention. Applicant has amended the claims as required by previous office actions in five separate amendments, and requests reconsideration of the rejection. There is nothing indefinite about claiming an invention broadly. An Applicant is entitled to claim an invention as broadly as the prior art allows. Just because a claim is broad in scope, does not make it indefinite. Applicant asserts that from any fair reading of the claims, it should be clear to those skilled in the art how the consumer user is awarded, and how a consumer user is selected by a sponsor based on demographic and psychographic (behavior based demographic) criteria, as required by the first Examiner to place the claim in condition for allowance.

Dkt. No. 53 at 106 (Oct. 23, 2003 Reply to OA).  Defendants argue that the patentee's statement that "a consumer user is selected by a sponsor based on demographic and psychographic" is a clear disclaimer and limits the claims to their construction.  The Court disagrees.  First, the patentee followed the alleged disclaimer with the statement that the recited claim language was "required by the first Examiner to place the claim in condition for allowance."  The prosecution history indicates that the first Examiner did not require the consumer user to be selected by a sponsor based on demographic and psychographic preferences.  Instead, as recited in the claims, the first Examiner only required that a sponsor designate an award/consumer and that the award be tailored to the preference of a consumer. Dkt. No. 48 at 251 (Jan. 5, 2002 Examiner Interview Summary).

Moreover, the patentee was not arguing for a narrow claim scope or attempting to

distinguish the claims from prior art. Instead, the patentee stated that "[t]here is nothing indefinite about claiming an invention broadly … Just because a claim is broad in scope, does not make it indefinite." (Dkt. No. 53 at 106.) The patentee then elaborated that the claims make clear "how a consumer user is awarded, and how a consumer user is selected by a sponsor based on demographic and psychographic (behavior based demographic) criteria …." (Dkt. No. 53 at 106.) The Court agrees and finds that the claims recite that this is performed by providing a "sponsor-selected specific award unit item tailored according to demographic and psychographic preferences of a sponsor-selected consumer user." '830 Patent at Claim 19.

### 3. Court's Construction

In light of the intrinsic evidence, the Court construes **"sponsor-selected consumer user"** to mean **"at least one consumer user selected by a sponsor."**

### D. *"demographic … preferences"*

| Disputed Term | Claim | Plaintiff's Proposal | Defendants' Proposal |
|---|---|---|---|
| "demographic … preferences" | 1, 4, 6, 11, 17, 19, 26-28, 34 | "preferences associated with a group of consumers that has a particular set of qualities | preferences based on directly observable traits of a consumer (*e.g.*, sex, marital status, income, occupation, location) |

The parties dispute whether the term "demographic … preferences" should be construed as "preferences associated with a group of consumers that has a particular set of qualities," as Plaintiff proposes, or as "preferences based on directly observable traits of a consumer," as Defendants propose. Plaintiff provides dictionary definitions and contends that "demographic information" relates to a set of qualities or characteristics associated with a particular group of people. (Dkt. No. 47 at 30-31.) Plaintiff states that it agrees with Defendants' construction to the extent that it refers to preferences based on consumer traits such as sex, marital status, income, occupation and location. (Dkt. No. 47 at 31.) However, Plaintiff disagrees with Defendants'

proposal of "directly observable traits" because it is not clear and creates a risk of jury confusion. (Dkt. No. 47 at 31.) For example, Plaintiff contends that income is a well-accepted demographic trait that may not be directly observable. (Dkt. No. 47 at 31.)

Defendants respond that their construction is consistent with the plain language of the claims, which distinguish demographic and psychographic preferences, and is consistent with their extrinsic evidence. (Dkt. No. 52 at 23–24.) Defendants argue that Plaintiff's construction should be rejected because it is based on general purpose dictionaries dated well before the '830 Patent's priority date or well after its issue date. (Dkt. No. 52 at 24.) Defendants also argue that Plaintiff's construction should be rejected because the phrase "that has a particular set of qualities" is ambiguous and unbounded. (Dkt. No. 52 at 24.) Defendants further contend that Plaintiff's proposed construction would improperly encompass its construction for the distinct term "psychographic preferences," which would make that phrase meaningless. (Dkt. No. 52 at 24.)

Plaintiff responds that Defendants have not shown that the accepted definitions for the disputed term have changed significantly over time. (Dkt. No. 62 at 9.) Plaintiff further argues that Defendants' reliance on both a 1996 source and a 2008 source contradicts their suggestion that Plaintiff's sources should be disregarded on the basis of temporal relevance. (Dkt. No. 62 at 9.) Plaintiff argues that the issue is not who has the better dictionary, but instead construing the terms to avoid jury confusion. (Dkt. No. 62 at 9.) Plaintiff further argues that Defendants' inclusion of "direct observability" risks jury confusion because not all demographics are directly observable (e.g., a person's income). (Dkt. No. 62 at 9.) For the following reasons, the Court construes **"demographic … preferences"** to mean **"preferences based on traits of a consumer, such as sex, marital status, income, occupation, and location."**

## 1. The Intrinsic Evidence

The term "demographic … preferences" appears in claims 1, 4, 6, 11, 17, 19, 26-28, and 34. The Court finds that the term is used consistently in the claims and is intended to have the same meaning in each claim. The claim language also indicates that "demographic preferences" is distinct from "psychographic preferences" by reciting that the "sponsor-selected specific award unit item" is "tailored to demographic *and* psychographic preferences of a sponsor-selected consumer user." *See, e.g.*, '830 Patent at Claim 1 (emphasis added). The Court will now turn to the remaining intrinsic evidence.

The specification provides an example of a type of demographic by stating the following:

> If the sponsor wishes to query the consumer database 200 at the step 354, then at a step 357 the host computer 18 conducts a search of the consumer database 200 for various information relating to consumer's participation in the sponsor's incentive programs. For example, such information may include *demographic* or psychographic information about the types of consumers who are participating in the sponsor's incentive programs. For example, the sponsor may be able to determine *the median age of consumers* who are participating in the sponsor's incentive programs.

'830 Patent at 18:43–54 (emphasis added). Consistent with the examples provided in Defendants' construction, the median age of a consumer is a trait of a consumer.[9] The Court will now turn to the extrinsic evidence provided by the parties.

## 2. The Extrinsic Evidence

Defendants provide an excerpt from The Dictionary of Social Market Research, published in 1996, which defines and contrasts demographics and psychographics as follows:

> The categorization of a market or other population groups, e.g., consumers, on the basis of psychological – as distinguished from demographic – dimensions, including activities, interests, opinions, values, attitudes, lifestyles, personality traits, such as innovativeness, sophistication, etc. In contrast, demographics describe states of physical being – age, sex, marital status, income, occupation,

---

[9] In its Opening Brief, Plaintiff stated that "[w]e would not object to adding Defendants' representative list of demographic traits to Kroy's proposed interpretation." (Dkt. No. 47 at 31.)

location, education, religious affiliation.

Dkt. No. 59 at 4 (Dictionary of Social Market Research) (emphasis added).  As with the example in the specification, this reference provides examples of demographics that are consistent with the examples listed in Defendants' construction.  Accordingly, the Court finds that "demographic … preferences" means "preferences based on traits of a consumer, such as sex, marital status, income, occupation, and location."

Regarding the parties' constructions, the Court finds that Plaintiff's "particular set of qualities" language fails to adequately distinguish this term from the term "psychographic preferences."  For example, consumers with a particular set of "attitudes, interests, values, etc," have a "particular set of qualities."  Similarly, the Court finds that Defendants "directly observable traits" is ambiguous and could create jury confusion.  For example, income is a well-accepted demographic that may not be directly observable.  Moreover, neither the intrinsic nor extrinsic evidence describes direct observability as the decisive aspect of a demographic trait.  Accordingly, the Court rejects these aspects of the parties' constructions.

### 3. Court's Construction

In light of the intrinsic and extrinsic evidence, the Court construes **"demographic … preferences"** to mean **"preferences based on traits of a consumer, such as sex, marital status, income, occupation, and location."**

### E. *"psychographic preferences"*

| Disputed Term | Claim | Plaintiff's Proposal | Defendants' Proposal |
|---|---|---|---|
| "psychographic preferences" | 1, 4, 6, 11, 17, 21, 26-28, 34 | "preferences associated with a consumer's attitudes, interests, values, opinions or behaviors" | "preferences based on non-directly observable traits of a consumer (*e.g.,* interests, opinions values, attitudes, lifestyles)" |

The parties dispute whether the term "psychographic preferences" should be construed as "preferences associated with a consumer's attitudes, interests, values, opinions or behaviors," as Plaintiff proposes, or as "preferences based on non-directly observable traits of a consumer," as Defendants propose. Plaintiff provides dictionary definitions and contends that "psychographic preferences" relates to a set of qualities or characteristics associated with a particular group of people. (Dkt. No. 47 at 30–31.) Plaintiff notes that the parties agree that a consumer's "psychographic preferences" are based on traits such as such as interests, opinions, values, attitudes and lifestyles. (Dkt. No. 47 at 32.) However, Plaintiff disagrees with Defendants' construction because it contends that the meaning of "directly observable traits" is not clear and creates a risk of jury confusion. (Dkt. No. 47 at 31.) For example, Plaintiff contends that lifestyle choices and behavior are well accepted psychological traits that may be directly observable. (Dkt. No. 47 at 33.)

Defendants respond that the specification is silent as to the meaning of the term "psychographic preferences" and direct the Court to industry-specific dictionaries. (Dkt. No. 52 at 20–21.) Based on the industry-specific dictionaries, Defendants contend that "psychographic preferences" should be construed as non-directly observable traits. (Dkt. No. 52 at 21.) Defendants argue that this construction is in harmony with the intrinsic record and should be adopted. (Dkt. No. 52 at 21.) Defendants further argue that Plaintiff's extrinsic evidence should be discounted because the definitions were provided after the patent issued. (Dkt. No. 52 at 22.) Defendants also argue that the weight given to Plaintiff's extrinsic evidence should be discounted because the definitions introduce ambiguity into the claim term. (Dkt. No. 52 at 22.) Finally, Defendants contend that their construction is consistent with the extrinsic evidence they provided. (Dkt. No. 52 at 22–23.)

Plaintiff responds that Defendants have not shown that the accepted definitions for the disputed term have changed significantly over time. (Dkt. No. 62 at 9.) Plaintiff further argues that Defendants' reliance on both a 1996 source and a 2008 sources contradicts their suggestion that Plaintiff sources should be disregarded on the basis of temporal relevance. (Dkt. No. 62 at 9.) Plaintiff contends that the issue is not who has the better dictionary, but instead construing the terms to avoid jury confusion. (Dkt. No. 62 at 9.) Plaintiff argues that Defendants' inclusion of "non-direct observability" risks jury confusion because some "psychographic preferences" may be directly observable (e.g., lifestyle choices and behavior). (Dkt. No. 62 at 9.)

For the following reasons, the Court construes **"psychographic preferences"** to mean **"preferences associated with a consumer's attitudes, interests, values, opinions, lifestyles, or behaviors."**

### 1. The Intrinsic Evidence

The term "psychographic preferences" appears in claims 1, 4, 6, 11, 17, 21, 26-28, and 34. The Court finds that the term is used consistently in the claims and is intended to have the same meaning in each claim. As with the previous term, the claim language and specification indicate that "psychographic preferences" is distinct from "demographic" by reciting that the "sponsor-selected specific award unit item" is "tailored to demographic *and* psychographic preferences of a sponsor-selected consumer user." *See, e.g.*, '830 Patent at Claim 1 (emphasis added).

Defendants state that specification is silent to the meaning of the term and provide extrinsic evidence to support their construction. (Dkt. No. 52 at 20.) Defendants contend that their construction is consistent with the specification, which discloses that psychographic or demographic information may be "obtained through consumer responses to inquiries answered

by the consumer" or through "survey-completion and question-and-answer incentive programs."

'830 Patent at 13:18–22; 41:62–67.  The Court does not disagree.  However, this portion of the

specification that describe collecting consumer data is also consistent with Plaintiff's

construction.  Thus, the Court will turn to the extrinsic evidence.

### 2.  The Extrinsic Evidence

Defendants provide an excerpt from The Dictionary of Social Market Research,

published in 1996, which defines and contrast demographics and psychographics as follows:

> The categorization of a market or other population groups, e.g., consumers, on the
> basis of psychological – as distinguished from demographic – *dimensions,*
> *including activities, interests, opinions, values, attitudes, lifestyles, personality*
> *traits, such as innovativeness, sophistication, etc.*  In contrast, demographics
> describe states of physical being – age, sex, marital status, income, occupation,
> location, education, religious affiliation. Because a person is seldom able to define
> these traits directly, they must be measured indirectly. Psychographics, therefore,
> are subject to ambiguous definition. They are "soft" statistics. By contrast, most
> demographic statistics have unambiguous definitions that cut across population
> segments and cultures. Some marketers argue that psychographics have replaced
> demographics for planning and marketing consumer products.

Dkt. No. 59 at 4 (Dictionary of Social Market Research) (emphasis added).  Defendants also

provide the following excerpt from The Encyclopedia of Survey Research Methods, which

defines psychographic measure as:

> [A] variable that represents a personal characteristic of an individual that is not [p.
> 635 ↓ ] a physical trait, as are demographic measures (age, gender, height, etc.).
> Rather, psychographic variables include personality traits, lifestyle preferences or
> interests, values or beliefs, and attitudes or opinions. *Because psychographics are*
> *not directly observable, as are many demographics, nor do they have a "factual"*
> *basis as do demographics, their measurement is less precise.*  Surveys are
> routinely used to measure psychographics, and they can serve as powerful
> independent variables in helping explain many dependent variables of interest.

Dkt. No. 59 at 8 (Encyclopedia of Survey Research Methods) (emphasis added).  Defendants

contend that these two sources "explain that psychographic traits are non-directly observable

traits."  (Dkt. No. 52 at 21.)  Defendants reach this conclusion based on the one sentence

emphasized above. (Dkt. No. 52 at 21.) However, analyzed in the context of all the relevant extrinsic evidence presented by the parties, the Court does not agree that this one sentence requires "psychographic preferences" to be preferences based non-directly observable traits. Granted, a number of psychographics traits may not be directly observable, but some are directly observable. For example, lifestyle choices and behavior are well accepted psychological traits that may be directly observable. Thus, the Court agrees with Plaintiff that Defendants' construction risks jury confusion and would introduce ambiguity into the claims.

That said, the Court appreciates that Defendants' construction attempts to clarify for the jury the distinctions between "demographic preferences" and "psychographic preferences." (Dkt. No. 52 at 22.) However, the Court finds that Defendants' concern is addressed by the Court finding that the recited "psychographic preferences" are distinct from the recited "demographic preferences." Moreover, the parties agree that a consumer's "psychographic preferences" are based on traits such as interests, opinions, values, attitudes, and lifestyles. (Dkt. No. 47 at 32.) Likewise, Plaintiff's proposed construction is consistent with the extrinsic evidence presented by Defendants. Accordingly, the Court adopts Plaintiff's construction with the addition of "lifestyles" to the list of traits included in Defendants' construction.

### 3. Court's Construction

In light of the intrinsic and extrinsic evidence, the Court construes **"psychographic preferences"** to mean **"preferences associated with a consumer's attitudes, interests, values, opinions, lifestyles, or behaviors."**

### F.  *"provider"*

| Disputed Term | Claim | Plaintiff's Proposal | Defendants' Proposal |
|---|---|---|---|
| "provider" | 1-4, 6, 11, 15-17, 19, 26-29, 31, 32, 35, 36 | "a participant who provides awards associated with an incentive program" | "individual or company that provides an incentive program" |

The parties dispute whether the term "provider" should be construed as "a participant who provides awards associated with an incentive program," as Plaintiff proposes, or as "individual or company that provides an incentive program," as Defendants propose. Plaintiff contends that Defendants' construction confuses the term "provider" with the term "sponsor." (Dkt. No. 47 at 24.) Plaintiff notes that the parties have stipulated to a construction for "sponsor," and argues that the specification does not use the terms "provider" and "sponsor" interchangeably. (Dkt. No. 47 at 24.) Plaintiff further argues that dependent claim 2 conclusively shows that "provider" is not synonymous with "sponsor," but instead encompasses all types of incentive program participants. (Dkt. No. 47 at 24.) Plaintiff further contends that the specification supports construing provider as a participant who provides awards associated with an incentive program. (Dkt. No. 47 at 24–25.)

Defendants respond that claims 1 and 19 recite "incentive programs of a plurality of providers," and that this plain language of the claims evidences that "provider" means "individual or company that provides an incentive program." (Dkt. No. 52 at 30.) Defendants also note that the specification does not use the term "provider" with reference to any of the primary components of the system of the invention, but instead implicitly discloses that the term "provider" means an individual or company that "provides" something. (Dkt. No. 52 at 30.) Defendants argue that Plaintiff's construction reads the term "provider" out of the claim by conflating it with the term "participant." (Dkt. No. 52 at 30–31.)  Specifically, Defendants note

that claim 19 recites both a "plurality of providers" and "a participant," and argue that Plaintiff's construction would eliminate the distinction between the terms "participant" and "provider" in this claim. (Dkt. No. 52 at 30–31.)

Plaintiff responds that Defendants correctly observe that the word "provider" refers to an individual or company that provides something. (Dkt. No. 62 at 6.) However, Plaintiff contends that the "something" are the awards associated with an incentive program. (Dkt. No. 62 at 6.) Plaintiff further argues that the claims do not recite "providers of incentive programs" and that the full context of the claims shows that "provider" refers to one who provides awards. (Dkt. No. 62 at 6.)

For the following reasons, the Court construes **"provider"** to mean **"individual or company that offers or provides an incentive program or provides awards associated with an incentive program."**

### 1. The Claim Language

The term "providers" appears in claims 1-4, 6, 11, 15-17, 19, 26-29, 31, 32, 35, and 36. The Court finds that the phrase is used consistently in the claims and is intended to have the same meaning in each claim. The Court also finds that the claim language provides substantial guidance on the meaning of the disputed phrase. For example, claim 1 recites "participation in incentive programs of a plurality of providers." Here, the claim language indicates that it is the consumer that participates in the incentive programs of a plurality of providers. Indeed, dependent claim 3 further specifies this by reciting "wherein the consumer user participates in said incentive programs of the plurality of providers via interaction with said browser." In order for the consumer to participate in the incentive program, the incentive program must be offered or provided by the plurality of providers. Likewise, claim 19 explicitly recites "wherein a

participant may participate in said incentive program" and that awards are provided to participants by "an inventory management system associated with each of a plurality of providers." Thus, the claim language indicates that the term "provider" is used broadly and includes an individual or company that offers or provides an incentive program, as well as an individual or company that provides awards associated with an incentive program. Thus, contrary to Plaintiff's suggestion, the term "provider" is not limited to only providing the actual awards associated with an incentive program, but may also include an individual or company that offers or provides an incentive program.

However, the Court agrees with Plaintiff that the claims indicate that the term "sponsor" and "provider" do not have the same scope. In fact, the claims indicate that "provider" is broader than "sponsor." Specifically, dependent claim 2 recites the system of claim 1 "wherein said plurality of providers comprise at least one of a host, a retailer, a merchant, and a sponsor." Thus, the claims indicate that a "provider" is not limited to one type of provider (e.g., a sponsor). And as discussed below, the specification provides explicit definitions for different types of "providers." Accordingly, the Court will now turn to the remaining intrinsic evidence.

## 2. The Intrinsic Evidence

Although the specification does not use the term "provider" with reference to a primary component of the system, the specification does explicitly define types of "providers." For example, the specification defines "host," "sponsor," and "retailer" as follows:

> The term "sponsor," as used herein, encompasses any individual or company that wishes to offer an incentive program or promotion.
> …
> The term "retailer," as used herein, encompasses any individual or company that wishes to provide awards and prizes to be associated with incentive programs.
> …
> The term "host," as used herein, encompasses any individual or company who wishes to provide a system for permitting sponsoring companies to offer

incentive programs to consumers, employees, suppliers, partners and the like of the individual or company, and for creation of databases of retail, catalog, sponsor and other items that permit automated fulfillment of specific items listed in computer inventory systems of retailers at a retail location.

'830 Patent at 7:51-8:21. Considering these definitions, the Court finds that Plaintiff's construction is too narrow and could exclude a "sponsor" and "host" from the scope of a "provider" because these individuals or companies do not necessarily provide the actual awards associated with an incentive program. Indeed, Plaintiff's construction is limited to a "retailer" as the term is defined in the specification.

Plaintiff points to the specification disclosure that awards may alternatively be provided by the incentive program sponsor, the host, or other parties as justification for its construction. (Dkt. No. 47 at 24.) However, the fact that a "sponsor" or a "host" may also provide an award, in addition to offering an incentive program, does not warrant narrowing the term "provider" to only providing awards. Indeed, providing an award is not possible until the incentive program is provided or offered to the consumer.

Likewise, the Court finds that Defendants' construction could limit "provider" to only a "host" because the specification defines "host" as individual or company that "provides" an incentive program. Again, this is not correct because the claims only require allowing a consumer to participate in an incentive program, which would encompass either offering or providing an incentive program. In other words, a "sponsor" can be a "provider" because it "offers" an incentive program to the consumer. Indeed, the specification discloses that in one exemplary embodiment "a typical consumer may log on to the web site, register as with the host system, and *participate* in one or more incentive programs." '830 Patent at 13:40–42. (emphasis added). In order to participate in one or more incentive program, the incentive programs have to be offered and provided to the consumer. Accordingly, the Court does not adopt either parties'

construction, but instead construes "provider" to mean "individual or company that offers or provides an incentive program or provides awards associated with an incentive program."

### 3. Court's Construction

In light of the intrinsic evidence, the Court construes **"provider"** to mean **"individual or company that offers or provides an incentive program or provides awards associated with an incentive program."**

### G. *"inventory management system"*

| Disputed Term | Claim | Plaintiff's Proposal | Defendants' Proposal |
|---|---|---|---|
| "inventory management system" | 1, 4, 6, 11, 16, 19, 26-28, 32, 34 | No construction necessary.<br><br>If construed, the term means: "one or more systems that manage inventory" | "a system maintained by a retailer to keep track of its available merchandise" |

The parties dispute whether the phrase "inventory management system" requires construction. Plaintiff contends that the phrase does not require construction. In the alternative, Plaintiff contends that the phrase should construed as "one or more systems that manage inventory." Defendants contend that the phrase should be construed as "a system maintained by a retailer to keep track of its available merchandise."

Plaintiff argues that Defendants' construction improperly narrows the claim by requiring the inventory management system to be maintained by a retailer (Dkt. No. 47 at 26.) Plaintiff contends that the term "provider" is not limited to a traditional retailer, and also refers to a merchant, sponsor, host, or other party that provides awards for an incentive program. (Dkt. No. 47 at 26.) Plaintiff also argues that Defendants' construction would introduce ambiguity into the claims because it is not clear what the phrase "maintained by" means or requires. (Dkt. No. 47 at 26.) Plaintiff argues that Defendants' construction is also incorrect because the claims are not

limited to tracking awards in the form of "merchandise," but may also include other types of awards. (Dkt. No. 47 at 26.) Finally, Plaintiff contends that the only possible need for judicial construction is to confirm the general rule that the indefinite article "an" means "one or more." (Dkt. No. 47 at 26.)

Defendants respond that the specification discloses that a retailer maintains a retailer inventory system to determine whether items are in inventory. (Dkt. No. 52 at 27.) Defendants also argue that during prosecution the patentee distinguished the prior art by touting the benefit of real-time knowledge. (Dkt. No. 52 at 27.) Thus, according to Defendants the patentee relinquished the open-ended construction Plaintiff now proposes. (Dkt. No. 52 at 28.)

Plaintiff responds that the phrase is not ambiguous and therefore should not be construed. (Dkt. No. 62 at 6.) Plaintiff also argues that the claim language is broader than the embodiment that Defendants point to in the specification. (Dkt. No. 62 at 6.) Plaintiff contends that this example is described as utilizing the inventory system of a retailer, but the claims recite "an inventory management system" and not an inventory management system maintained by a retailer. (Dkt. No. 62 at 6.) Plaintiff further argues that the specification states that "retailer" refers to "any individual or company that wishes to provide awards and prizes to be associated with incentive programs …" (Dkt. No. 62 at 7.) Plaintiff contends that to avoid limiting the claims to require an inventory management system of a traditional retailer, the patentee more generally recited an inventory management system "associated with each of said plurality of providers." (Dkt. No. 62 at 7.)

Plaintiff also argues that Defendants' requirement that the system "keep track of … available merchandise" is extraneous to the broader claim language. (Dkt. No. 62 at 7.) Finally, Plaintiff argues that the prosecution history states that the invention involves "communication

with an inventory management system of multiple providers," which is consistent with the plain claim language. (Dkt. No. 62 at 7.) Plaintiff also argues that the prosecution history states that an "award unit can then be allocated from inventory to ensure availability," which confirms that the system may track "award units" and not just "merchandise." (Dkt. No. 62 at 7)

For the following reasons, the Court construes the term **"inventory management system"** to mean **"at least one system that provides an inventory of an item (e.g., merchandise) or type of items (e.g., coupons, points, services) recorded in the award database."**

### 1. The Claim Language

The term "inventory management system" appears in claims 1, 4, 6, 11, 16, 19, 26-28, 32, and 34. The Court finds that the term is used consistently in the claims and is intended to have the same meaning in each claim. Claims 1 and 19 recites an "inventory management system associated with each of said plurality of providers." As discussed above, dependent claim 2 recites that the "plurality of providers comprise at least one of a host, a retailer, a merchant, and a sponsor." Thus, the Court agrees that the claims do not support Defendants' requirement that the system is "maintained by a retailer." Instead, the patentee recited the broader term "provider," which may be a retailer, but is not required to be a retailer.

Likewise, claims 1 and 19 refer to a "sponsor-selected specific award unit item" and not strictly merchandise. As discussed above regarding the phrase "sponsor-selected specific award unit item," merchandise is not the only specific award item. Finally, the Court notes that the claims use the open-ended transitional phrase "comprising" and recite "an inventory management system." Accordingly, the Court finds that the claims encompass either a singular or plural interpretation (i.e., "at least one system"). The Court will now turn to the remaining

intrinsic evidence.

## 2. The Intrinsic Evidence

The specification describes both an "award database" and an "inventory system" of a retailer at a retail location. *See, e.g.*, '830 Patent at 8:17. For example, the specification states that the inventory system can update the award database with the retailer's current inventory as follows:

> The award database 204 that is created by participation by the retailer is also connected via an electronic data interchange 126 to the retailer's proprietary inventory system 212. Thus, the award database 204 can be automatically updated to reflect the retailer's current inventory according to inventory numbers, such as SKUs, type of inventory, or the like.

'830 Patent at 15:41–47. The specification further describes the award database and the retailer's inventory system as follows:

> The award database 204 is also a conventional database, such as an Oracle database. An application program, such as an Oracle Program controls the input of data into the database, the structure of data records in the database, and the modification of or addition to data in the database. The award database consists of records for each registered retailer, as well as associated records for the retailer, including the prizes offered by the retailer, the prices of such prizes, the geographic location of the prizes, and any other information entered by the retailer, including information directly provided to the award database 204 through an electronic data interchange 126 connected by a custom interface with the inventory system 212 of the retailer. **An application program connects the award database to the retailer's inventory system, so that each prize recorded in the award database can be tied, by an inventory number or SKU, to the exact item, or type of items, in the inventory of the retailer.** In particular, the award database 204 can identify the geographic location of the prize, so that an application program can determine the closest geographic location of the retailer to the location of the consumer who has won a particular prize. The database is then updated as new retailers are added, and the record for each retailer is updated upon the occurrence of specific events, including a retailer's adding a new prize, purchase of a prize, a consumer winning a prize, selection of a fulfillment option, and the like. Each event that requires an update of the award database calls the application program, such as an Oracle program, necessary to modify the relevant records in the award database.

'830 Patent at 46:13–41 (emphasis added). Thus, the specification discloses that the claimed

"inventory management system" provides an inventory of an item or type of items recorded in the award database. And as further defined in the specification, the item or type of items recorded in the award database may include "all types of incentives, including merchandise, coupons, points, cash, services and other forms of incentives." '830 Patent at 7:45–47.

Finally, the prosecution history confirms that "inventory management system" should be construed to mean a system that provides an inventory of an item (e.g., merchandise) or type of items (e.g., coupons, points, services) recorded in the award database. To distinguish the claims from the prior art, the patentee stated the following:

> Kanter has <u>no</u> knowledge of merchant provider's inventory data, let alone real time knowledge and allocation of inventory.
> …
> Automated award fulfillment, according to the present invention, ***includes sponsor designated or selected redemption*** whereby the sponsor of the award may select or determine which award unit (see Specification at 93, line 9, for example) will be provided to the customer, by communication with an ***inventory management system of multiple providers*** and may designate the location of the redemption (see Specification at page 95, line 20, for example). The selection can also include a specific consumer user selected by the sponsor which can, e.g., be instructed to go to a store identified as having the award by the inventory management system to pick up the award unit (See for example page 97, line 14-17). The award unit can then be allocated from inventory to ensure availability upon a visit by the specific consumer user.

Dkt. No. 49 at 41 (Aug. 26, 2002 Reply to OA) (emphasis in original). Clearly, the patentee argued that knowledge and allocation of inventory is an important aspect of the recited inventory management system. It allows a sponsor to identify a store having an item or type of items and directs the consumer to that store. Given the prosecution history, the Court finds that Plaintiff's construction does not adequately capture the arguments made by the patentee. Indeed, "managing inventory" may fail to capture providing an inventory of an item or type of items recorded in the award database, as described in the intrinsic evidence. Accordingly, the Court does not adopt either parties' construction.

### 3. Court's Construction

In light of the intrinsic evidence, the Court construes **"inventory management system"** to mean **"at least one system that provides an inventory of an item (e.g., merchandise) or type of items (e.g., coupons, points, services) recorded in the award database."**

### H. *"host" and "host computer"*

| Disputed Term | Claim | Plaintiff's Proposal | Defendants' Proposal |
|---|---|---|---|
| "host" | 2, 31, 32, 35 | "any individual or company who wishes to provide a system for permitting sponsoring companies to offer incentive programs to consumers, employees, suppliers, partners and the like of the individual or company" | "individual or company who wishes to provide a system for permitting sponsoring companies to offer incentive programs to customers" |
| "host computer" | 1, 3, 4, 6, 7, 11, 15, 16, 17, 19 | | |

As an initial matter, the parties ask the Court to construe the term "host" and not specifically the term "host computer" that appears in asserted claims 1 and 19. Because the terms are related and appear separately in various claims, the Court will construe both "host" and "host computer" to avoid confusion. The parties' constructions are close to the definition of "host" provided in the specification with the dispute focusing on whether the term "host" should include "any individual or company," as Plaintiff proposes, or whether the term should be construed as an "individual or company," as Defendants propose. The parties also dispute whether the construction requires listing that incentive programs are offered to "consumers, employees, suppliers, partners and the like of the individual or company," as Plaintiff proposes, or whether the incentive programs are offered only to "customers," as Defendants propose.

Plaintiff notes that the parties offer slight variants of the definition of "host" that is

provided in the specification. (Dkt. No. 47 at 22.)  Plaintiff further notes that "host" does not appear separate from "host computer" in asserted claims 1 and 19. (Dkt. No. 47 at 22.)  Because the parties have not presented "host computer" as a disputed term, Plaintiff contends that the Court should not construe the term "host." (Dkt. No. 47 at 22.)  Alternatively, Plaintiff argues that if the Court construes the term "host," then it should adopt the definition provided in the specification. (Dkt. No. 47 at 22.)

Defendants respond that although the parties appear to agree in concept for the construction of the term "host," Defendants' proposal would be more helpful to a jury. (Dkt. No. 52 at 31.)  Defendants argue that the term "any" used in Plaintiff's construction creates confusion when substituted into the claim. (Dkt. No. 52 at 31.)  Defendants also argue that the claims are limited to "a sponsor-selected consumer user," so including "employees, suppliers, partners and the like of the individual or company" in the construction would be inconsistent or at least confusing. (Dkt. No. 52 at 31.)

Plaintiff responds that the Court should either adopt the express definition from the patent specification or decide not to construe the term "host." (Dkt. No. 62 at 5.)  Plaintiff argues that Defendants' construction inappropriately limits the host to providing incentive programs to "customers," whereas the specification more broadly states "to consumers, employees, suppliers, partners and the like …." (Dkt. No. 62 at 5.)

For the following reasons, the Court construes **"host"** to mean **"any individual or company who wishes to provide a system for permitting sponsoring companies to offer incentive programs to consumers, employees, suppliers, partners and the like of the individual or company."**  The Court construes **"host computer"** to mean **"a computer provided by a host."**

## 1. The Intrinsic Evidence

The term "host" appears in claims 2, 31, 32, and 35. The Court finds that the term is used consistently in the claims and is intended to have the same meaning in each claim. The term "host computer" appears in claims 1, 3, 4, 6, 7, 11, 15, 16, 17, and 19. The Court finds that the term is used consistently in the claims and is intended to have the same meaning in each claim. As indicated by the parties, the Court finds that it would be confusing to construe the term "host" without also construing the term "host computer." The plain language of the claims indicate that a "host" is not a "host computer," but instead a "host" provides a "host computer." For instance, independent claim 1 recites a "host computer" coupled to a network, while dependent claim 2 recites that the "plurality of providers comprise at least one of a host." Thus, to construe "host" without also construing "host computer" could lead to confusion because the claims do not use "host" interchangeably with "host computer." Accordingly, the Court will construe both "host" and "host computer." The Court will now turn to the remaining intrinsic evidence.

As noted by Plaintiff, the specification provides an explicit definition for the term "host." The specification defines host as follows:

> The term "host," as used herein, encompasses any individual or company who wishes to provide a system for permitting sponsoring companies to offer incentive programs to consumers, employees, suppliers, partners and the like of the individual or company, and for creation of databases of retail, catalog, sponsor and other items that permit automated fulfillment of specific items listed in computer inventory systems of retailers at a retail location.

'830 Patent at 8:10–17. The Court finds that Plaintiff's construction mirrors the definition provided in the specification and should be adopted for the term "host." Defendants do not provide a persuasive reason why the Court should not adopt the definition provided by the patentee in the specification. Indeed, the parties have agreed to the definition of "sponsor" that is provided in this same section of the specification. Likewise, because the Court is also

construing the term "host computer," Defendants' concern for confusion is addressed. For example, the construction for "host" need not be inserted in the term "host computer" in the asserted claims as Defendants suggest.

Regarding the term "host computer," the Court finds that the term should be construed to mean "a computer provided by a host." The specification provides an exemplary embodiment of a host computer and indicates that it is part of the host system. '830 Patent at 11:63–12:8. Furthermore, the specification provides that the incentive programs offered to consumers "may be incentive programs provided by the operator of the host system, or third party incentive programs that have been identified by the host for listing on a directory." '830 Patent at 12:42–44. Thus, the host computer is a computer provided by a host that permits sponsoring companies to offer incentive programs.

## 2. Court's Construction

In light of the intrinsic evidence, the Court construes **"host"** to mean **"any individual or company who wishes to provide a system for permitting sponsoring companies to offer incentive programs to consumers, employees, suppliers, partners and the like of the individual or company."** The Court construes **"host computer"** to mean **"a computer provided by a host."**

## V. CONCLUSION

The Court adopts the above constructions. The parties are ordered that they may not refer, directly or indirectly, to each other's claim construction positions in the presence of the jury. Likewise, the parties are ordered to refrain from mentioning any portion of this opinion, other than the actual definitions adopted by the Court, in the presence of the jury. Any reference to claim construction proceedings is limited to informing the jury of the definitions adopted by

the Court.

**It is SO ORDERED.**

**SIGNED this 4th day of June, 2014.**

ROY S. PAYNE
UNITED STATES MAGISTRATE JUDGE