**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | | |
|---|---|---|
| KROY IP HOLDINGS, LLC, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | CASE NO. 2:12-cv-800-WCB |
| | § | |
| SAFEWAY, INC., | § | |
| | § | |
| *Defendant.* | § | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

In one of several summary judgment motions filed in this patent infringement action, the

defendant, Safeway, Inc., has moved for summary judgment of invalidity as to all of the asserted

claims of U.S. Patent No. 7,054,830 ("the '830 patent"), which is owned by plaintiff Kroy IP

Holdings, LLC.  Dkt. No. 148.  Kroy opposes the motion.  Dkt. No. 162.  After full briefing and

a hearing on the motion, the Court GRANTS Safeway's motion for summary judgment.

## I. BACKGROUND

The two asserted independent claims of the '830 patent are claims 1 and 19.  They

provide as follows:

1. A system for incentive program participation and automated award fulfillment,
comprising:

a host computer coupled to a network;

a first database accessible from said host computer; and

an automated award fulfillment application program executed on said host
computer for participation in incentive programs of a plurality of
providers in communication with an inventory management system
associated with each of said plurality of providers wherein said

1

automated award fulfillment application program provides sponsor-selected fulfillment, said automated award fulfillment application program comprising:

code adapted to provide a sponsor-selected specific award unit item, said sponsor-selected specific award unit item being tailored to demographic and psychographic preferences of a sponsor-selected consumer user; and

code adapted to provide a sponsor-selected geographic location for fulfillment.

19.   A method for providing an incentive programs [sic] and automating [sic] award fulfillment, comprising:

providing a host computer;

providing an incentive program on the host computer, wherein a participant may participate in said incentive program;

providing a database of awards on the host computer associated with the incentive program; and

providing automated award fulfillment of said awards to participants, including

providing communication with an inventory management system associated with each of a plurality of providers wherein said automated award fulfillment comprises

providing a sponsor-selected specific award unit item,

providing said sponsor-selected specific award unit item tailored according to demographic and psychographic preferences of a sponsor-selected consumer user, and

providing a sponsor-selected geographic location for fulfillment.

In addition to the two independent claims, Kroy asserts claims 20, 21, 23, and 24, all of

which depend from claim 19.[1]  Those claims add that the database of awards includes awards

_____

[1]   Kroy originally asserted claims 1 and 19-25 of the '830 patent against Safeway, but it subsequently took the position that it was not pursuing infringement as to claims 22 and 25.  Dkt. No. 146-3, at 57.  Safeway has not moved for summary judgment of invalidity on those claims.

from a plurality of sponsors (claim 20); that the method of claim 19 further comprises associating an award with the incentive program and associating a fulfillment method with the award (claim 21); "providing a card comprising memory for storing data associated with a user" (claim 23); and adding to the limitations of claim 23 that the card has a personal identification number (claim 24).

In its summary judgment motion, Safeway argues that the asserted claims are invalid for anticipation under U.S. Patent No. 5,822,735 to DeLapa, and that they are invalid for obviousness under a combination of DeLapa and U.S. Patent No. 5,970,469 to Scroggie ("Scroggie").

## II.  DISCUSSION

At the outset, Kroy makes two related general arguments in response to Safeway's summary judgment motion.  The Court finds neither of those arguments persuasive.

Kroy's principal argument is that Safeway's summary judgment motion is fatally deficient because it does not view the patent from the perspective of a person of ordinary skill in the art.  Relatedly, Kroy argues that Safeway's motion should be denied because Safeway has not submitted an expert report in support of the motion.

Those arguments do not have force in this case because the '830 patent does not involve technology of any significant complexity.  While the claims are difficult to parse, that is not because they involve complex technology, but because they use unnecessarily abstract language seemingly invented for the purpose of the patent, and because they are unnecessarily verbose. Once past the abstractions and the prolixity, the claims require no technical background to understand, and even the lengthy specification requires no more than an educated layperson's knowledge of computers to comprehend.  Nothing in Kroy's briefing, or in the declarations of its

expert, provides any reason to believe that a person of ordinary skill in the art relating to the '830 patent would understand that patent differently than would a lay reader.

According to Kroy's expert, Robert Sherwood, a person of ordinary skill in the art relating to the '830 patent would have a bachelor's degree in marketing, 3-4 years of work experience developing or managing retail incentive programs, and a working knowledge of the use of retail computer systems and networks in retail incentive programs.  Dkt. No. 163-2, at 16. For purposes of this motion, the court accepts Kroy's submission as to the level of skill in the art and therefore treats the issue of the level of skill of a person of ordinary skill in the art as not being in dispute.

The level of skill identified by Kroy does not reflect a high degree of technical expertise. Therefore, accepting Kroy's submission as to the level of knowledge of a person of ordinary skill in the relevant art, the Court concludes that expert evidence is not necessary, or even particularly helpful, in understanding the '830 patent or in understanding it in the way a person of ordinary skill in the art would understand it.  See Wyers v. Master Lock Co., 616 F.3d 1231, 1240 & n.5 (Fed. Cir. 2010); Perfect Web Techs., Inc. v. InfoUSA, Inc., 587 F.3d 1324, 1329 (Fed. Cir. 2009); Centricut, LLC v. Esab Grp., Inc., 390 F.3d 1361, 1369 (Fed. Cir. 2004); Union Carbide Corp. v. Am. Can Co., 724 F.2d 1567, 1573 (Fed. Cir. 1984).

The same principle applies to Mr. Sherwood's analysis of the DeLapa prior art patent. As in the case of the '830 patent, the DeLapa patent does not involve complex technology, but consists mainly of general descriptions of relatively simple functions performed on a computer system.  The specification and claims of DeLapa are easily understood without the assistance of expert testimony; in fact, Mr. Sherwood's declarations are really more in the nature of supplemental legal argument about anticipation and obviousness than they are about the

technology disclosed in the '830 patent and the DeLapa patent.  The Court therefore declines

Kroy's invitation to deny Safeway's summary judgment motion on the ground that Safeway

failed to offer an expert declaration in support of its motion or failed to analyze the '830 patent

from the perspective of a person of ordinary skill in the art.

Having addressed those preliminary matters, the Court now proceeds to discuss the two

arguments Safeway has raised in its summary judgment motion: anticipation under DeLapa and

obviousness in light of DeLapa and Scroggie.

## A.  Anticipation Under DeLapa

As noted, the claims of the '830 patent are heavy on vague and abstract terms that are

not self-explanatory, such as "automated award fulfillment application program,"

"communication with an inventory management system," "a sponsor-selected specific award unit

item," and "a sponsor-selected geographic location for fulfillment."  There is no suggestion in

the patent or in the evidence presented by Kroy in response to Safeway's motion that those terms

are terms of art in the field, as opposed to terms created for purposes of the patent.  The patent

also uses the terms "host," "sponsor," "retailer," and "provider."  The first three terms are

defined in the patent; the last is not.  The definitions are very broad and largely overlapping.

Thus, the term "host" is defined, in pertinent part, as "encompass[ing] any individual or

company who wishes to provide a system for permitting sponsoring companies to offer incentive

programs to consumers," '830 patent, col. 8, ll. 10-13; the term "sponsor" is defined as

"encompass[ing] any individual or company that wishes to offer an incentive program or

promotion," id., col. 7, ll. 51-53; and the term "retailer" is defined as "encompass[ing] any

individual or company that wishes to provide awards and prizes to be associated with incentive

programs," id., col. 7, ll. 54-56.  The term "provider," although not defined in the patent, was

construed by the Court to mean an "individual or company that offers or provides an incentive program or provides awards with an incentive program." Dkt. No. 90, at 40. The Court explained that a "provider," as that term is used in the '830 patent, can include a host, a retailer, a merchant, or a sponsor. Id. at 38. As counsel for Kroy acknowledged at the hearing on Safeway's summary judgment motion, the same party can be the host and the sponsor of a program, as well as both a retailer and a provider of awards. Dkt. No. 219, at 7-12.

After translating the abstractions into more comprehensible language, claim 1 of the '830 patent can be seen to recite a program-based system for providing incentive awards to consumers.[2] The program, which is run on a "host computer," has several required features. First, it contains a database of awards that is linked in some manner to some type of inventory management system maintained by a plurality of providers. Second, the program provides for a sponsor to select consumer awards tailored to the demographic and psychographic preferences of consumers selected by the sponsor. Third, the program provides for the sponsor to select the geographic location where the awards can be redeemed. Because the host and the sponsor can be the same entity, and the host/sponsor can also be a provider, all of the functions set forth in the claim can be performed by the entity that offers the incentive award program.

Claim 19 is directed to a method instead of a system, but the limitations of claim 19 otherwise largely parallel those of claim 1.

The scope of the claims is perhaps best understood by examining Kroy's theory as to why Safeway's "Just For U" program infringes. At the hearing on the invalidity motion, counsel for Kroy explained that when Safeway sponsors an incentive award program involving products

---

[2]     The specification separately identifies "promotional programs" and "incentive programs," see '830 patent, col. 41, line 1, but the claims simply refer to "incentive programs." The Court will refer to the claimed programs simply as "incentive award programs" without seeking to distinguish between the two types of programs identified in the specification.

manufactured by other companies, it serves as the sponsor of the program, and the manufacturers serve as the providers.  As the sponsor, Safeway selects "which consumer receives [a particular] award, which award the consumer receives, how that award is tailored to the consumer's preferences, and the location at which that award can be redeemed."  Dkt. No. 219, at 11. Emphasizing the interchangeability of the elements set forth in the claims, counsel explained that a sponsor, such as Safeway, can also serve as the host, id. at 8, and that Safeway could also be a "provider," along with third parties who provide awards for the program, since "provider" is defined as "an individual or company that offers or provides an incentive program or provides awards associated with an incentive program."  Id. at 9; see generally id. at 7-16.

The prior art DeLapa patent is directed to a system for generating and redeeming discount coupons in which selected coupons are presented to selected consumers based on information about those consumers, such as their addresses, the size and makeup of their households, and their purchasing history.  DeLapa is limited to coupon redemption programs, while the '830 patent applies to incentive programs generally.  However, coupon redemption programs are expressly identified as among the incentive programs claimed in the'830 patent, so a prior art reference that features a coupon redemption program and satisfies all the other limitations of the '830 patent would invalidate that patent for anticipation.  See Atlas Powder Co. v. Ireco, Inc., 190 F.3d 1342, 1346 (Fed. Cir. 1999) ("[I]f granting patent protection on the disputed claim would allow the patentee to exclude the public from practicing the prior art, then that claim is anticipated, regardless of whether it also covers subject matter not in the prior art."); Vas-Cath Inc. v. Mahurkar, 935 F.2d 1555, 1562 (Fed. Cir. 1991); Titanium Metals Corp. of Am. v. Banner, 778 F.2d 775, 781 (Fed. Cir. 1985).

Kroy describes the DeLapa patent as entailing "a system in which an administrator of [a] coupon marketplace involving consumer members, retailers and manufacturers generates personalized printed coupon packages mailed to consumers selected by the administrator."  Dkt. No. 163, at 12.  That description is accurate as far as it goes, but DeLapa's disclosure is much more detailed.

DeLapa discloses a system of automated generation of coupons by computer.  In DeLapa, the coupons, once generated, are mailed to consumers rather than being made available to consumers over a computer network.  However, that feature does not distinguish DeLapa from the '830 patent, because there is no specific limitation in the asserted claims of the '830 patent requiring that the transmission of incentives such as coupons be by network, rather than by mail. In fact, Kroy made that very point in its response to the motion for summary judgment of non-infringement filed by The Kroger Co., the defendant in an action that was previously consolidated with this one.  In response to Kroger's argument that its mail delivery of coupons did not constitute automated fulfillment within the meaning of the '830 patent, Kroy stated that "the claims are not restricted to any particular method of providing coupon information to the customer."  Case No. 2:13-cv-141, Dkt. No. 36, at 2.  Kroy explained, id. at 15, that "Kroy's patented invention does not claim any system for, or method of, delivering coupons to customers.  The '830 patent claims place no limitation on the method of delivery of the coupon to the customer, they therefore allow the use of mail, the internet, or any other means." Accordingly, the fact that the coupons in DeLapa are delivered by mail does not render the DeLapa prior art inapposite.

Safeway points to various portions of the DeLapa disclosure that correspond to each of the limitations of the asserted claims of the '830 patent. Each of those limitations is discussed below, beginning with the limitations found in claims 1 and 19.

**1. An "automated award fulfillment application program" (claim 1) and "automated award fulfillment" (claim 19)**

Kroy argues that DeLapa does not teach or disclose the "automated award fulfillment application program" required by claim 1. In particular, Kroy contends that "DeLapa's administrator corresponds to the host, and the host computer is the central computer system, including at least main computer **38** and the administrator's computer **65** provided by the administrator." Dkt. No. 163, at 8. According to Kroy, Safeway has not identified any program that runs on the DeLapa computers that constitutes the "automated award fulfillment application program."

Kroy's argument fails for two reasons. First, DeLapa discloses a "focused coupon system **15**," which includes "cyclic coupon selection." See DeLapa Fig. 1. The focused coupon system **15** "includes a coupon generation and redemption process **20** that is performed on system hardware **21**." DeLapa, col. 8, ll. 33-35. The "system hardware **21**," which is depicted in DeLapa Fig. 4, includes a program administrator's computer and a "telemarketing computer." The program administrator's computer and the telemarketing computer are both connected to the "main computer" in the "central processing center," which in turn is connected to an "in-store system." The "coupon generation and redemption process **20**," which is depicted in DeLapa Figs. 7A and 7B, involves the program administrator (or "program administration center") processing retailer data through a "coupon parameter database," which consists of "records regarding coupons which are available for distribution to consumers and records regarding the

retailer participation in coupon system **15**." DeLapa, col. 8, line 66, through col. 9, line 3.  The

program administrator uploads that coupon data to the main computer, or central processing

center **29**, which houses the master data base **31**.  <u>See</u> Figs. 4 and 7B.   In addition, the "coupon

generation and redemption process" involves collecting data from consumers, through

questionnaires, telephone interviews, or other means, which is maintained in the member data

base **25** in the telemarketing center and is uploaded to the master data base **31** in the central

processing center **27**.  <u>See</u> DeLapa, col. 8, ll. 37-65.  The relationships among these components

and functions are illustrated in Figures 4, 7A, and 7B from DeLapa, which are reproduced below:



FIG. 4



**FIG. 7A**



**FIG. 7B**

DeLapa thus discloses a system in which a coupon generation program is run on a combination of computers.  The computers include (1) the main computer, which assigns coupons to consumers and downloads coupon data to the in-store processor, see Fig. 7B; (2) the telemarketer computer, which receives and stores information regarding consumers; and (3) the program administrator's computer, which receives and stores information regarding retailers and maintains coupon data.  The data processed on the program administrator's computer includes matters such as the "parameters of the particular product for which a manufacturer has agreed to provide a promotional program," the starting and expiration dates of the program, and the limit (if any) on the number of coupons that can be distributed.  DeLapa, col. 9, ll. 6-11.  The coupon parameter data base **37** in the program administrator's computer also includes "relationship parameters relating appropriate coupons and particular consumption needs of coupon program members," which "facilitate the assignment of particular coupons to particular customers."  Id., col. 9, ll. 11-17.

In sum, DeLapa discloses a system that performs "automated award fulfillment," as that term is used in the '830 patent.  The functions of the DeLapa system are divided among three databases residing on three computers, but the operations of the three computers are integrated so that, as a whole, they effectuate an "automated award fulfillment program" within the meaning of the '830 patent.  Kroy acknowledges that the "host" in the '830 patent corresponds to the central computer system in DeLapa, "including at least main computer **38** and the administrator's computer **65** provided by the administrator."  Dkt. No. 163, at 8.  Based on the disclosure of DeLapa, the Court concludes that the "automated award fulfillment application program" in DeLapa is executed on the host computer.[3]

---

[3]   While the Court rejects the suggestion that the use of separate computers to run the

The second reason that the Court rejects Kroy's argument that nothing in DeLapa corresponds to the "automated award fulfillment application program" is that the claims define the "automated award fulfillment application program" as comprising two types of code (in the case of claim 1) and three steps (in the case of claim 19). Claim 1 recites that the "automated award fulfillment application program" comprises "code adapted to provide a sponsor-selected specific award unit item" and "code adapted to provide a sponsor-selected geographic location for fulfillment." Claim 19 recites that "automated award fulfillment" comprises "providing a sponsor-selected specific award unit item, providing said sponsor-selected specified award unit item tailored according to demographic and psychographic preferences of a sponsor-selected consumer user, and providing a sponsor-selected geographic location for fulfillment." The claims do not recite any other elements that must be satisfied with regard to the "automated award fulfillment application," other than that the fulfillment objective must be accomplished through the operation of a computer program. The individual "comprising" elements that constitute the "automated award fulfillment application," as set forth in claims 1 and 19, are all satisfied in the DeLapa patent, for the reasons set forth in sections 6 and 7, below.

### 2.  A "host computer" (claim 19) that is "coupled to a network" (claim 1)

Safeway argues that the "focused coupon system **15**" of DeLapa is organized around a particular retail establishment providing an incentive program. See Dkt. No.148, at 10, citing DeLapa, col. 19, ll. 36-39; see also id., col. 3, ll. 36-40 ("In a preferred form, the method is organized around a particular retail store or chain of stores . . . ."). The "program administrator"

---

automated award fulfillment system in DeLapa is sufficient to defeat Safeway's anticipation argument, the Court concludes that even if that distinction were deemed sufficient to avoid anticipation, the asserted claims of the '830 patent would be invalid for obviousness, as it would be obvious that functions performed on three separate computers could easily be constituted so as to be performed on a single computer.

maintains data regarding the retailers, maintains coupon data, and "schedules coupons for each cyclical mailing of coupons."   Id., col. 9, ll. 3-6.   Safeway further notes that the "computer system hardware **21** is structured about a main computer **38**," id., col 6, ll. 62-63, and includes an "administrator's personal computer **65**," id, col. 7, ll. 9-13.   Thus, in DeLapa, the retailer, and in particular the program administrator, performs the functions of the "host" in the '830 patent through the operations performed on the administrator's computer **35** and on the main computer **38**.   Moreover, the computers in the DeLapa system, including the administrator's computer and the system's main computer, are coupled to a network, see id. col. 7, ll. 6-13, so the requirement in the asserted claims of the '830 patent that the host computer be "coupled to a network" is satisfied.

Kroy argues that DeLapa does not disclose that a retailer provides a system for permitting sponsoring companies to offer incentive programs.  Instead, according to Kroy, DeLapa teaches away from that approach by disclosing that a central administrator controls the host system. Kroy argues that the administrator corresponds to the host and that the host computer "is not a retailer's computer but rather is the central computer system, including at least main computer **38**, and the administrator's computer **65** provided by the administrator."  Dkt. No. 163, at 7.

There are two flaws in Kroy's argument.  First, the '830 patent does not require that a retailer provide the system that permits sponsoring companies to offer incentive programs.  It merely requires that the "host computer" be "coupled to a network" and that the incentive program be executed or provided on the host computer.   Thus, it is unnecessary for the administrator (and the administrator's computer) in DeLapa to be affiliated with (and operated by) a retailer.  Given the broad definition of the terms "host" and "host computer" in the '830 patent ("any individual or company who wishes to provide a system for permitting sponsoring

companies to offer incentive programs to consumers, employees, suppliers, partners and the like

of the individual company" and "a computer provided by a host," respectively, <u>see</u> Dkt. No. 90,

at 46), DeLapa clearly discloses "a host computer coupled to a network" that executes or

provides the incentive program.   Second, because DeLapa contemplates that its incentive

program will be "organized around a particular retail establishment," DeLapa, col. 19, ll. 36-37,

it makes clear that the incentive system disclosed in the patent can be run by a single retailer or

retail chain, with the administrator's computer and the main computer being operated by the

retailer that issues coupons.

**3.  A "first database accessible from said host computer" (claim 1) and a "database of awards on the host computer associated with the incentive program" (claim 19)**

DeLapa discloses a master database that includes a "Coupon Master Structure file"

containing data for each coupon in the system.   The master database resides on the main

computer in the system and is accessible from it.   <u>See</u> DeLapa, col. 8, ll. 63-65; col. 10, ll. 33-42;

col. 12, ll. 23-25.   That limitation of claims 1 and 19 is therefore satisfied.   Kroy does not appear

to dispute that DeLapa discloses this limitation.

**4.   "Providing an incentive program on the host computer, wherein a participant may participate in said incentive program" (claim 19)**

DeLapa's coupon incentive program is provided on a computer, as the DeLapa

specification makes abundantly clear.   <u>See</u> DeLapa, col. 8, ll. 33-35 ("Focused coupon system **15**

includes a coupon generation and redemption process **20** that is performed on system hardware

**21**.")   Kroy does not appear to dispute that DeLapa discloses this limitation.

**5. "Communication with an inventory management system associated with each of" the plurality of providers (claims 1 and 19).**

Kroy contends that DeLapa fails to disclose that the fulfillment application program is in "communication with an inventory management system associated with each of said plurality of providers," as required by claim 1, or that DeLapa "provid[es] communication with an inventory management system associated with each of a plurality of providers," as required by claim 19. The Court concludes that in light of the construction of that limitation of the '830 claims previously adopted by the Court, DeLapa discloses such "communication with an inventory management system associated with each of [the] plurality of providers."

The Court construed the term "inventory management system" to mean "at least one system that provides an inventory of an item (e.g., merchandise) or type of items (e.g., coupons, points, services) recorded in the award database," Dkt. No. 90, at 45, and it construed the term "provider" broadly to mean "individual or company that offers or provides an incentive program or provides awards associated with an incentive program," id. at 37. DeLapa discloses "communication with an inventory system associated with each of [the] plurality of providers" in two ways.

First, DeLapa discloses that when a consumer redeems a coupon generated by the system, the machine-readable code is used for various purposes. Among those, according to DeLapa, is to generate a transaction record and to upload it to the store management computer "in order to adjust the inventory records for the product and for statistical analysis and the like." DeLapa, col. 16, ll. 58-62 (emphasis added). Thus, DeLapa explicitly provides that the computer-generated record of the coupon redemption transaction may be used to adjust the retailer's inventory of products. In order to perform that task, DeLapa clearly contemplates that the

16

incentive program will be "in communication with" inventory systems of the various retailers who participate in the incentive program or provide the awards associated with the program.

Second, DeLapa discloses that its coupon award system stores data regarding coupons that includes "a limit to the number of coupons which may be distributed (if any)." DeLapa, col. 9, ll. 6-11. The master database, which includes a file for "records of all coupons sent to and redeemed by a member," id., col. 11, ll. 61-62, maintains a "current coupon" file that keeps count of the number of coupons used and the number that remain in stock, id., col. 12, ll. 52-56; col. 13, ll. 9-10. Moreover, when generating coupons, the system accesses the database to determine whether a coupon has been exhausted. Id., col. 14, ll. 31-67. The master database therefore serves as an inventory management system providing an inventory of the coupons recorded in the award database. Because the purpose of the inventory management system is to affect coupon distribution decisions by determining whether sufficient coupons of particular types remain available to be distributed to consumers, the inventory management system in DeLapa clearly communicates with the award fulfillment application program.

Kroy's response to Safeway's argument regarding the inventory management system is that DeLapa does not disclose "determining a count of the number of coupons that remain in stock or any other information about the provider's inventory of coupons (e.g., where they can be redeemed, what products they relate to, or other inventory information)." Dkt. No. 163, at 9. In the first place, however, a system that determines when the permissible number of awards has been exhausted is a type of inventory management system, and DeLapa plainly discloses just such a system. See DeLapa, col. 14, ll. 36-38, 51-56. Kroy suggests that an inventory management system must track the particular numbers of items in inventory, and that it is not sufficient that the system simply ascertain when the supply of items is exhausted. That

contention is not supported by anything but Kroy's expert's conclusory assertion to that effect.[4]

An inventory management system is not required to track inventory with a particular level of detail, and a system that reports when a particular item is exhausted provides at least a minimal form of inventory management.  In any event, the inventory management system disclosed in DeLapa does more than that, as the "Current Coupon Data Structure" contains entries for the maximum number of coupons and the number that have already been used.  DeLapa, col. 12, ll. 52-56; col. 13, ll. 9-10.  DeLapa therefore discloses an inventory management system, as that term is used in the '830 patent.

It is also the case that the inventory management system disclosed in DeLapa is associated with a plurality of providers.  DeLapa discloses that the system is capable of distributing "coupons of various manufacturers."  DeLapa, col. 4, ll. 37-38.  It also discloses that product codes for "each manufacturer" are necessary to associate the coupons with the corresponding products.  Id., col. 16, line 63, through col.17, line 7.

Kroy contends that the master database in DeLapa "is not an award fulfillment application program communicating with one or more external inventory management systems associated with the coupon providers."  Dkt. No. 163, at 9.  The '830 patent,  however, contains no requirement that the inventory management system be "external" to the award fulfillment program; all that is required, in the case of claim 1, is that the award fulfillment program be "in

---

[4] Kroy's position in this regard appears to be in tension with the position it took in the related case of Kroy IP Holdings, L.L.C. v. Autozone, Inc., Case No. 2:13-cv-888 (E.D. Tex.), where Kroy argued that the "inventory management system" of the '830 patent is not required to track the quantity of goods.  See Dkt. No. 119, at 6 (Kroy: the term inventory management system "should not be construed in litigation to require providing quantity information."); see also Dkt. No. 144, at 85-86.  The Court agreed with Kroy.  See Dkt. No. 189, at 13 ("the Court is not persuaded that the meaning of the claim term 'inventory' in the '830 patent should be narrowed to require that an inventory always contain information about the 'quantity' of items available.").

communication with" an inventory management system associated with each of the providers.  In the case of claim 19, all that is required is that there be "communication with an inventory management system associated with each of a plurality of providers."  There is no restriction in either of those claims as to where the inventory management system or systems reside.

Finally, Kroy makes the related argument that the '830 patent system "includes an award database on the host that is separate from the inventory management systems associated with providers," and that the claims of the '830 patent separately recite providing a database of awards on the host computer and providing communication with an inventory management system associated with the providers.  From that, Kroy asserts that the same "master database" that serves as a "database of awards on the host computer" cannot also satisfy "the separate inventory management system elements of the '830 patent claims."  Dkt. No. 163, at 10.  In fact, however, the claims of the '830 patent do not require that the database of awards and the inventory management system associated with each of the providers must reside in separate structures.  It is well settled that the same structure can satisfy more than one limitation in a patent claim unless the claim specifies otherwise.  See Intellectual Property Dev., Inc. v. UA-Columbia Cablevision of Westchester, Inc., 336 F.3d 1308, 1320 n.9 (Fed. Cir. 2003); Interactive Gift Express, Inc. v. CompuServe Inc., 231 F.3d 859, 872 (Fed. Cir. 2000); Gibbs v. Triumph Trap Co., 26 F.2d 312, 314 (2d Cir. 1928) (L. Hand, J.).  In any event, DeLapa discloses that the inventory management function is performed by a separate data structure (the "Current Coupon Data Structure") within the master database, so the inventory management function in DeLapa is "separate" to the extent that it is performed by a discrete data structure separately identified in the DeLapa patent.

**6. "Sponsor-selected specific award unit item being tailored to demographic and psychographic preferences of a sponsor-selected consumer user" (claims 1 and 19)**

DeLapa plainly discloses sponsor-selected fulfillment.  The administrator in the DeLapa system identifies "a particular consumer, printing a packet of coupons for the identified consumer, [and] transmitting the packet to the consumer."  DeLapa, col. 3, ll. 23-40.  In this regard, the administrator can be treated as the sponsor, or as acting for a sponsor, as that term is used in the '830 patent.  The entire purpose of the DeLapa invention is to help manufacturers target certain coupons to certain consumers; for that purpose, the manufacturers serve as "sponsors" who select the award unit items to direct to consumer users.  See id., col. 19, line 65, through col. 20, line 2.  That is particularly clear in light of Kroy's position in response to Safeway's summary judgment motion of noninfringement, where Kroy argued (and the Court agreed) that an award unit item is selected by the sponsor even if the sponsor merely offers a group of awards to the consumer and the consumer chooses which, if any, of those awards to redeem.  See Dkt. No. 162, at 8-12.  Moreover, DeLapa discloses "coupon data packages" that constitute "specific award unit items" within the meaning of that term in the '380 patent, because they consist of the coupon with corresponding identifying and classifying information.  See DeLapa, col. 10, line 32, through col. 15, line 60.

There is no room for doubt that DeLapa discloses that the specific award unit items (the coupons, including their identifying and classifying information) are tailored according to the demographic and psychographic preferences of sponsor-selected consumer users.  DeLapa repeatedly refers to the use of demographic and psychographic information in determining which coupons to send to particular consumers; indeed, that is the fundamental idea underlying the invention in DeLapa.  Thus, DeLapa discloses that consumers who participate in the focused

coupon program provide "demographic data" such as their addresses, that the information is stored in the database, and that the system "selects a plurality of coupons for each member based upon that member's data."  DeLapa, col. 4, ll. 22-49; col. 8, ll. 33-65; col. 10, ll. 33-42; col. 13, ll. 28-38.   DeLapa also discloses tailoring the coupon packets that are sent to particular consumers based on "shopping preferences" or "attributes of the consumer," which constitute psychographic preferences, i.e., "preferences associated with the consumer's attitudes, interests, values, lifestyles, or behaviors."  Id., col. 4, ll. 33-39; col. 6, ll. 7-19; Dkt. No. 90, at 33.  DeLapa makes clear, for example, that coupon packet decisions are based on the purchase histories of individual consumers.  See id. at col. 9, line 58, through col. 10, line 7; col. 10, ll. 33-42; col. 11, ll. 61-67; col. 19, line 64, through col. 20, line 12.[5]

Kroy argues that DeLapa does not disclose this limitation of the '830 patent, because DeLapa "does not disclose the retailer having control over award selection or customer selection," and does not permit "an incentive program sponsor to provide specific award unit items selected by a sponsor that are tailored to demographic and psychographic preferences of a sponsor-selected consumer user."   The problem with that argument is that it does not address Safeway's contention that the administrator in DeLapa qualifies as a "sponsor," as that term is used in the '830 patent.  The definition of "sponsor" in the '830 patent is very broad:  it includes "any individual or company that wishes to offer an incentive program or promotion."  '830 patent, col. 7, ll. 51-53.  Because a host can also be a sponsor, as Kroy concedes, selection of the award or the consumer who is to receive the award that is done by the host/sponsor would fall

---

[5]    Kroy has not challenged the proposition that purchase history reflects the psychographic preferences of consumers.   Nor could it, as Kroy argued in a related case that purchase history reflects psychographic preferences and persuaded the Court to adopt that position.  See Kroy IP Holdings, L.L.C. v. Autozone, Inc., Case No. 2:13-cv-888, Dkt. No. 162, at 26-32.

within the claims of the '830 patent.  Therefore, the disclosure in DeLapa that the administrator

selects the consumers who are to receive particular awards, and targets those consumers based on

demographic and psychographic preferences, anticipates this limitation of the '830 patent.

**7.  Code adapted to provide a "sponsor-selected geographic location for fulfillment" (claims 1 and 19).**

DeLapa also discloses sponsor selection of the geographic location for fulfillment.  The

patent explains that what it refers to as the "focused coupon system" is intended to be used "to

induce each member to shop at the retailer participating in" the system, and "to induce the

consumer to the retailer's store."  DeLapa, col. 5, ll. 10-17.  The patent further explains that the

coupon system "is organized around a particular retail establishment and is intended to increase

the pool of customers who regularly use that store . . . ."  Id. col. 19, ll. 36-38; see also id., col.

20, ll. 9-12 (discussing the use of the focused coupon system to "induce consumers to shop at a

particular store").  Thus, DeLapa discloses that its focused coupon system directs consumers to

particular stores where they can redeem their coupons, i.e., particular geographic locations for

fulfillment.

Kroy again contends that the administrator in DeLapa does not qualify as a "sponsor," as

that term is used in the '830 patent.  But again, that argument is not persuasive.  The

administrator in the DeLapa system, who directs the system by which a consumer is offered the

coupon incentive program, can qualify as a sponsor under the broad definition of "sponsor" in

the '830 patent, and therefore the administrator's selection of the geographic location for

fulfillment in DeLapa reads on the sponsor's selection of the geographic location for fulfillment

in the '830 patent.  In any event, the discussion in DeLapa of the use of the coupon system to

direct consumers to particular geographic locations is not limited to administrators; it also

applies to such strategies employed by retailers and manufacturers.  See DeLapa, col. 5, ll. 10-26 (retailers) and col 19, line 55, through col. 20, line 12 (manufacturers).

In passing, Kroy asserts that the "geographic location for fulfillment" limitation is not satisfied because the selection of the retail location for fulfillment in DeLapa is "based on information that the customer provides to the telemarketer or administrator when registering for the program."  Dkt. No. 163, at 13.  It is unclear why Kroy thinks that fact is relevant to the anticipation inquiry, since the "geographic location for fulfillment" limitation does not attach any significance to the source of the information that the sponsor uses to select the location for fulfillment.

For those reasons, each of the limitations of independent claims 1 and 19 of the '830 patent is disclosed in the DeLapa patent in the context of a coupon reward program.

### 8.  The dependent claims

The additional limitations contained in the asserted dependent claims can also be found in DeLapa.

Claim 20 adds to claim 19 that the database of awards includes awards from a "plurality of sponsors."  That limitation is disclosed by DeLapa's reference to the database including awards from "various manufacturers."  DeLapa, col. 4, ll. 37-38.  Claim 21 adds to claim 19 that providing automated award fulfillment further comprises associating an award with the incentive program and associating a fulfillment method with the award.  That limitation is disclosed by DeLapa's discussion of a method of associating an award with the incentive program through the coupon selection process and its disclosure of a fulfillment method, i.e., mailing the coupons to the intended recipients, id., col. 14, line 30, through col. 15, line 63, who redeem them at specified stores, id., col. 5, ll. 10-17; col. 19, ll. 36-38; col. 20, ll. 9-12.  Claim 23 adds to claim

19 the use of "a card comprising memory for storing data associated with a user."   That

limitation is disclosed by DeLapa's discussion of the use of electronic customer cards, including

cards with memory.  Id., col. 1, ll. 41-57.  Finally, claim 24 adds to claim 23 that the data on the

card is a personal identification number.  That limitation is disclosed by the same portion of the

DeLapa specification, which explicitly addresses the use of cards comprising a personal

identification numbers.  Id.

For the foregoing reasons, the Court concludes that DeLapa anticipates the asserted

claims of the '830 patent and that no reasonable jury could find to the contrary.

### B.  Obviousness Under DeLapa and in View of Scroggie

Safeway argues that even if the Court fails to conclude that DeLapa anticipates the

asserted claims of the '830 patent, the Court should hold those claims invalid for obviousness in

light of the combination of DeLapa and Scroggie.  The Court agrees that the asserted claims

would have been obvious in light of those references and therefore holds that the asserted claims

are invalid for obviousness, which provides an alternative ground for granting summary

judgment to Safeway.

### 1.  Obviousness under DeLapa alone

The Court does not regard DeLapa as needing supplementation by Scroggie in order to

serve as a basis for a finding of obviousness.  Even if the disclosures of DeLapa were to be

regarded as falling short of satisfying the requirements of anticipation, the '830 patent would still

be obvious in light of DeLapa alone.  It is well settled that a patent can be obvious in light of a

single reference if it would have been obvious to modify that reference in a way that results in

the patented invention.  See Graham v. John Deere Co., 383 U.S. 1, 21-16 (1966) (finding the

patent at issue invalid on two grounds, each based on single-reference obviousness); Boston

Scientific Scimed, Inc. v. Cordis Corp., 554 F.3d 982, 990-992 (Fed. Cir. 2009) (overturning jury verdict of non-obviousness based on single-reference obviousness); B.F. Goodrich Co. v. Aircraft Braking Sys. Corp., 72 F.3d 1577, 1582-83 (Fed. Cir. 1996).  The Court has concluded that DeLapa discloses all of the claim limitations of the '830 patent.  But if any of those limitations are deemed not to be explicitly disclosed in DeLapa, the Court concludes that they would be obvious from the DeLapa reference and that no reasonable finder of fact could conclude to the contrary.

DeLapa discloses an automated, computer-driven "focused coupon system," which enables a party wishing to offer a coupon-based incentive program to target particular consumers based on their demographic characteristics and psychographic factors such as their purchasing histories.  The system disclosed in DeLapa expressly provides for computers to record the customers' characteristics and track their purchases, to match those characteristics and purchases to particular coupons, and to direct the selected coupons to selected consumers.  The system also provides for the creation and distribution of coupons for the products of multiple manufacturers, and it determines when the available coupons for each manufacturer or product have been exhausted.  Finally, DeLapa discloses that its system is capable of using targeted coupons to direct consumers to particular retail stores, i.e., particular geographic locations where the coupons can be redeemed.

Even assuming that Kroy is correct that DeLapa does not anticipate the '830 patent, Kroy has not pointed to any limitations of the '830 patent that would not have been obvious to obtain by simple modifications of the DeLapa reference.  First, even if Kroy is correct in arguing that DeLapa does not disclose a "host" that provides a system for sponsoring companies to offer incentive programs, but instead discloses a separate central administrator that controls the host

system, any modification necessary to convert the "administrator" of DeLapa into the "host" of the '830 patent would be trivial in light of the similarity in the functions performed by the "host" and the "administrator."

Second, given that DeLapa discloses a system for determining when the number of coupons of particular types has been exhausted, it would be obvious to modify DeLapa to provide not only a determination of when the coupons were exhausted, but also an indication of how many coupons have been distributed at any particular time and how many remain available. Kroy does not seem to dispute that such capability would be sufficient to constitute an "inventory management system" and thus to satisfy the "in communication with an inventory management system" limitation of the '830 patent.

Third, Kroy argues that DeLapa does not disclose sponsor-selected fulfillment because the administrator in DeLapa "serves only as an intermediary facilitator," and not as a sponsor. Dkt. No. 163, at 10.  As in the case of the "host" limitation, it would be trivial, in light of the similarities in the functions of the administrator and the sponsor, to modify the DeLapa system so that the tasks of the administrator would be performed by the sponsor.

Fourth, Kroy argues that DeLapa "does not disclose the retailer having control over award selection or customer selection," and that DeLapa "does not disclose code running on a host system that permits an incentive program sponsor to provide specific award unit items selected by a sponsor that are tailored to demographic and psychographic preferences of a sponsor-selected user."  That argument again seems to be predicated on perceived differences between the role of the host, the sponsors, and the retailers in the '830 patent system and the role of the administrator in the DeLapa system.  Even assuming that the argument is based on more than simple differences in nomenclature, it would be trivial to modify DeLapa to shift functions

from the administrator to other entities that would clearly satisfy the definitions of "host" and "sponsor" in the '830 patent.

Finally, Kroy argues that in DeLapa the retail location for fulfillment is selected by the administrator, not by the sponsor.  Once again, to the extent that the definition of "sponsor" is considered insufficiently broad to include the "administrator" of DeLapa, it would be obvious to allocate the administrator's function to a sponsor, since those functions—and the overall operation of the program—are otherwise identical.  Accordingly, the Court concludes that the accused claims of the '830 patent would have been obvious based on DeLapa alone.

### 2.  Obviousness under DeLapa in view of Scroggie

Even if DeLapa alone were not sufficient to render the '830 patent invalid for obviousness, combining DeLapa with Scroggie would have that effect, as Safeway contends. Safeway points to particular limitations in the asserted claims of the '830  patent and argues that, assuming DeLapa is found lacking with respect to those limitations, Scroggie teaches those limitations and would lead to a combination of references that would render the '830 patent invalid.

First, as Safeway argues, Scroggie discloses the "specific award unit item" limitation of the '830 patent because it discloses a "dynamic coupon" that "contains not just a product code and coupon conditions, but also the consumer's name or household id. [sic: "identification"], the retailer id. where the coupon must be redeemed, and a coupon sequence number for added security."  Scroggie, col. 10, ll. 13-17.  Therefore, even if the coupons of DeLapa are regarded as not constituting "specific award unit items," Scroggie expressly discloses that coupons can contain other information.  That disclosure satisfies the definition of "specific award unit item" in the Court's claim construction, which was "a specific award item and all of the corresponding

identifying or classifying information." Dkt. No. 90, at 24. Because the coupons of DeLapa include bar codes that can encode various kinds of information, the decision to include additional information on the coupon of the sort chosen by Scroggie would have been obvious.

Second, Safeway argues that Scroggie discloses sponsor-selected fulfillment because Scroggie makes clear that the incentives that are offered to consumers are selected by the retailer or manufacturer. As Scroggie explains, "the Web site through which customers communicate in accordance with the present invention is a cooperative site involving both retailers and manufacturers, to provide customers with a variety of information, planning aids, and shopping incentives from multiple sources." Scroggie, col. 4, ll. 12-18. Because DeLapa makes clear that its system is sufficiently flexible that it can be operated by a single retailer as well as by an administrator working on behalf of retailers and manufacturers, it would be obvious to modify DeLapa to create a system in which retailers and manufacturers operate the system directly, even assuming that limitation is not satisfied by DeLapa alone.

Third, Safeway contends that Scroggie teaches that the "sponsor-selected specific award unit item" is tailored to "demographic and psychographic preferences of a sponsor-selected consumer user," as required by the '830 patent claims. Scroggie explicitly discloses the storage of "selected demographic information" of consumers and the targeting of consumers "based on customer profile or demographic information maintained by the system administrator and selected by the manufacturer." Scroggie, col. 12, line 53, through col. 13, line 31. Similarly, Scroggie discloses that in its system, consumers may be targeted by their purchasing histories and buying patterns, which constitute psychographic preferences, as previously acknowledged by Kroy. Id., col. 4, ll. 39-47; col. 12, ll. 28-33, 60-63; col. 13, ll. 19-23.

28

Finally, Scroggie discloses the limitations of dependent claims 23 and 24, in which the system uses an identification card with memory for storing data associated with the user, and in which the data is a personal identification number.  Scroggie discloses tracking each consumer's purchasing behavior through the use of "some form of  unique identification during the purchase transactions, such as a check-cashing card, a credit card, a magnetically encoded check, or some other form of identification," Scroggie, col. 12, ll. 14-18; see also id., col. 12, ll. 60-63 ("The database **502** is developed as a result of consumers being uniquely identified on each visit to the store, by use of a frequent shopper card, a credit card, or some other form of identification."). That disclosure clearly describes the use of cards containing information uniquely identifying the consumer, including the use of cards such as credit cards that identify the consumer by reference to an identification number unique to the consumer's card.  That portion of the disclosure of Scroggie reinforces the disclosure of DeLapa, which discusses the use of electronic customer cards and personal identification numbers to identify particular consumers and to enter purchases into the store's in-store computer system.  DeLapa, col. 1, ll. 41-57

The Court concludes that it would have been obvious to combine DeLapa and Scroggie, and that a reasonable finder of fact could not conclude to the contrary.  The two references relate to exactly the same field of art, and they involve very similar limitations.  Indeed, the limitations addressed above from Scroggie are simply more explicit forms of the corresponding limitations found in DeLapa.  There is no apparent reason why a person would not be motivated to combine the two, even assuming that the limitations contained in more detail in Scroggie were deemed not to be present in DeLapa.

### 3.  Secondary considerations

Kroy briefly alludes in its brief to what it claims are "secondary considerations of non-obviousness."  Dkt. No. 163, at 18.  Kroy claims that the evidence it has offered through its expert, Mr. Sherwood, shows that the '830 patent would not have been obvious because the invention met with commercial success; it provided a solution to long-felt unmet needs; it met with skepticism by industry participants; and other approaches to solving the same problems had failed.

Evidence of secondary considerations is always relevant, but it does not suffice to overcome a strong showing of obviousness in a case in which obviousness is clear from a comparison of the prior art references and the patent in suit.  See Western Union Co. v. MoneyGram Payment Sys., Inc., 626 F.3d 1361, 1373 (Fed. Cir. 2010); Wyers v. Master Lock Co., 616 F.3d 1231, 1246 (Fed. Cir. 2010); Asyst Techs., Inc. v. Emtrak, Inc., 544 F.3d 1310, 1316 (Fed. Cir. 2008); Leapfrog Enters., Inc. v. Fisher-Price, Inc., 485 F.3d 1157, 1162 (Fed. Cir. 2007).  This is such a case, as the Court concludes that the showing of obviousness in this case—even apart from the showing of anticipation—is compelling and is not called into doubt by the evidence of secondary considerations.

The secondary consideration evidence proffered by Kroy does not constitute persuasive evidence of non-obviousness.  As to commercial success, Kroy argues that the accused system and others like it have been successful, and that the success of those systems shows that the patented invention must not have been obvious.  But the success of Safeway's system and others like it is indicative of non-obviousness only if the patented invention was new; if such a system had already been developed, as Safeway contends, the success of such systems cannot be attributed to the novelty of the invention.  It merely indicates that the idea—regardless of who

30

first developed it—was well-received.  Kroy's argument as to the importance of commercial success thus carries with it the risk of circularity—it supports the inference of non-obviousness only if the invention was not already readily available, which is true only if the invention was non-obvious and not anticipated.  That is one of the reasons that the courts have held that a strong showing of obviousness (sometimes referred to as a strong prima facie showing of obviousness) overcomes the probative value of secondary consideration evidence such as evidence that the idea underlying the invention has met with commercial success.  See, e.g., SIBA Neurosciences, Inc. v. Cadus Pharm. Corp., 225 F.3d 1349, 1358-59 (Fed. Cir. 2000).

In this case, clear and convincing evidence shows that the asserted claims of the '830 patent were anticipated by DeLapa and obvious in light of DeLapa alone and the combination of DeLapa and Scroggie, and that no reasonable finder of fact could conclude otherwise.  That showing is sufficiently strong that Kroy's evidence as to the commercial success of marketing programs based on concepts found in the Kroy patent does not support Kroy's contention that the commercial success of those programs is attributable to novel ideas disclosed for the first time in the '830 patent.

Kroy's evidence of long-felt unmet need suffers from the same flaw as the evidence of commercial success.  That flaw is illustrated by two sentences in Mr. Sherwood's declaration that are devoted to this point.  He states that the invention of the '830 patent provided "solutions to the needs that the prior art failed to solve.  Although there was considerable interest and work being performed in the area, no one developed a solution that solved the problems that the '830 invention solved."  Dkt. No. 163-2, at 44.  But the assertion that the invention satisfied a long-felt unmet need depends on the conclusion that the invention of the '830 patent was novel.  It does not constitute independent evidence of the novelty of the invention.  The probative force of

Mr. Sherwood's further assertion that "I am not aware of any other evidence suggesting that anyone else working in the field had either identified the problems addressed by the '830 patent or provided any solution to them," id., at 45, depends entirely on the correctness of his conclusion that references such as DeLapa and Scroggie neither identified nor solved the problems addressed by the '830 patent, a proposition that the Court has rejected as clearly incorrect in light of an analysis of the claims of the '830 patent and the disclosures in the prior art.

As to the failure of other approaches, Mr. Sherwood's declaration contains a single conclusory paragraph essentially reiterating his contention that "[p]rior approaches did not solve the problems that [the '830 patent inventors] sought to overcome." Dkt. No. 163-2, at 45. Mr. Sherwood's assertion in that regard contains no supporting information and again depends entirely on his conclusion that the invention of the '830 patent was novel.

Finally, Mr. Sherwood asserts that the evidence shows that there was widespread skepticism about the invention, which according to Mr. Sherwood indicates that it was a novel solution to the problems it addressed. Mr. Sherwood relies on evidence, reported to him by York Eggleston, one of the inventors of the '830 patent, that Mr. Eggleston had difficulty persuading commercial entities to license his invention. Marketers at the time that the '830 patent application was pending, according to Mr. Sherwood, typically used only non-personalized coupons, which could be redeemed at any store, and manufacturers had even less control over where their coupons were redeemed. Dkt. No. 163-2, at 46. Because of the way coupons were distributed, sponsors were prevented from "targeting them to the unique preferences of individual customers." Id. In addition, according to Mr. Sherwood, the industry did not

recognize the benefits of coordinating award fulfillment programs with retailers' inventory management systems and controlling the geographic location for fulfillment of incentive awards.

There is some tension between Kroy's argument about commercial success and its argument about widespread skepticism. Success in licensing a patent is often cited as evidence of non-obviousness because it can serve as an indication that the invention has met with commercial success. See Soverain Software LLC v. Newegg Inc., 705 F.3d 1333, 1346-47 (Fed. Cir. 2013); Arkie Lures, Inc. v. Gene Larew Tackle, Inc., 119 F.3d 953, 957 (Fed. Cir. 1997); EWP Corp. v. Reliance Universal Inc., 755 F.2d 898, 907 (Fed. Cir. 1985). Yet in this case, Kroy argues that lack of success in licensing is evidence of non-obviousness because it shows that others were skeptical of the invention. As a matter of simple logic, it seems unlikely that commercial success and lack of commercial success can both be indicative of non-obviousness in the same case.

Beyond that, Kroy's evidence fails to show a nexus between the lack of success in marketing the '830 patent and industry skepticism regarding the invention. Lack of marketing success can be attributable to numerous causes, including that the industry may have regarded the '830 patent as not having broken new ground and thus not to be worthy of licensing. That explanation seems particularly likely in light of the fact that the features of the '830 patent were explicitly taught in the prior art references discussed above. See Ohio Willow Wood Co. v. Alps South, LLC, 735 F.3d 1333, 1344 (Fed. Cir. 2013). The evidence therefore does not show that Mr. Eggleston's inability to market his invention successfully reflected industry skepticism that in turn was attributable to the novelty of his invention. In sum, the evidence of secondary considerations proffered by Kroy is not particularly persuasive, and it would be far short of

sufficient to overcome the powerful evidence of obviousness in the eyes of a reasonable finder of fact.

For the foregoing reasons, the Court holds that claims 1, 19, 20, 21, 23, and 24 of the '830 patent are invalid for anticipation and obviousness.

It is SO ORDERED.

SIGNED this 29th day of May, 2015.

_____
WILLIAM C. BRYSON
UNITED STATES CIRCUIT JUDGE