IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| KROY IP HOLDINGS, LLC, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | CASE NO. 2:12-cv-800-WCB |
| | § | |
| SAFEWAY, INC., | § | |
| | § | |
| *Defendant*. | § | |

## MEMORANDUM OPINION AND ORDER

In this patent infringement action, defendant Safeway, Inc., has moved for summary judgment of invalidity on the ground that the asserted claims of Kroy's patent are directed to ineligible subject matter.  Dkt. No. 140.  The Court GRANTS the motion.

## I.  BACKGROUND

Plaintiff Kroy IP Holdings, LLC, is the record owner of U.S. Patent No. 7,054,830 ("the '830 patent"), which relates to a method and system for providing incentive award programs over a computer network.  The concept underlying the '830 patent is that it creates a computerized means for companies to design or select incentive programs and to provide prizes to consumers who participate in the programs.

Kroy asserts that defendant Safeway, Inc., infringes claims 1, 19, 20, 21, 23, and 24 of the '830 patent.[1] The two independent claims of the '830 patent are claims 1 and 19.  Those claims recite the following:

1.  A system for incentive program participation and automated award fulfillment, comprising:

a host computer coupled to a network;

a first database accessible from said host computer; and

an automated award fulfillment application program executed on said host computer for participation in incentive programs of a plurality of providers in communication with an inventory management system associated with each of said plurality of providers wherein said automated award fulfillment application program provides sponsor-selected fulfillment, said automated award fulfillment application program comprising:

code adapted to provide a sponsor-selected specific award unit item, said sponsor-selected specific award unit item being tailored to demographic and psychographic preferences of a sponsor-selected consumer user; and

code adapted to provide a sponsor-selected geographic location for fulfillment.

19.  A method for providing an incentive programs [sic] and automating [sic] award fulfillment, comprising:

providing a host computer;

providing an incentive program on the host computer, wherein a participant may participate in said incentive program;

---

[1]  Kroy originally asserted claims 1 and 19-25 of the '830 patent against Safeway, but it subsequently took the position that it was not pursuing infringement as to claims 22 and 25. Dkt. No. 146-3, at 57.  Safeway's motion for summary judgment of patent ineligibility is directed at all of the claims that Kroy originally asserted, and the Court therefore addresses claims 1 and 19-25 in this order.

> providing a database of awards on the host computer associated with the
> incentive program; and
>
> providing automated award fulfillment of said awards to participants,
> including
>
>> providing communication with an inventory management system
>> associated with each of a plurality of providers wherein said
>> automated award fulfillment comprises
>>
>> providing a sponsor-selected specific award unit item,
>>
>> providing said sponsor-selected specific award unit item tailored
>> according to demographic and psychographic preferences of a
>> sponsor-selected consumer user, and
>>
>> providing a sponsor-selected geographic location for fulfillment.

In plain English, claim 1 recites a program-based system for providing incentive awards to consumers.[2]  The program, which is run on a "host computer," has several required features: it contains a database of awards in communication with an inventory management system of the company offering the incentive awards (referred to as a "provider"); it provides for a company that wishes to offer an incentive program or promotion (referred to as a "sponsor") to select customer awards tailored to the demographic and psychographic preferences of customers selected by the sponsor; and it provides for the sponsor to select the geographic location where the awards can be redeemed.  According to Kroy, a sponsor and a provider can be the same entity, in which case all of the functions set forth in the claim are performed by the company that

---

[2]    The specification separately identifies "promotional programs" and "incentive programs," see '830 patent, col. 41, line 1, but the claims simply refer to "incentive programs." The Court will refer to the claimed programs simply as "incentive award programs" without seeking to distinguish between the two types of programs identified in the specification.

offers the incentive award program.  Claim 19 is directed to a method instead of a system, but the limitations of claim 19 otherwise parallel those of claim 1.

The asserted claims that depend from claim 19 add that the database of awards includes awards from a plurality of sponsors (claim 20), that the method comprises the additional steps of "associating an award with the incentive program" and "associating a fulfillment method with the award" (claim 21), and that the method comprises the additional step of "providing a card comprising memory for storing data associated with a user" (claim 23).  The asserted claims that depend from claim 23 add that the data is "a personal identification number" (claim 24), and that the data is "information relating to a user's participation in said incentive program" (claim 25). The asserted claim that depends from claim 21 adds that "associating a fulfillment method" comprises providing a program that "identifies an award based on the geographic proximity of an award winner to a redemption location of an award in the database of awards" (claim 22).

The '830 specification acknowledges that "[i]ncentive award programs, in which companies contract with sponsoring companies for programs to promote sales of the sponsoring companies' products or services, are well-known."  '830 patent, col. 1, ll. 30-33; col. 7, ll. 51-53. Such programs "offer awards and incentives to modify behavior of individual customers and to direct the consumers to some pre-determined action, such as purchase of products or services upon visiting a retail site, viewing advertising, testing a product, or the like."  Id., col. 1, ll. 39-42.

The specification states that traditional, non-computerized incentive programs have various drawbacks for sponsors, including the costs of generating and administering the programs, tracking the participation of consumers in the programs, and fulfilling the awards or

prizes won in the programs.  '830 patent, col. 1, line 65, through col. 2, line 10.  Traditional incentive programs also have drawbacks for consumers, such as the difficulty of tracking participation in multiple programs.  Id., col. 1, ll. 49-64.  The specification further points out that non-automated incentive programs, such as promotional mailings and coupon distribution and redemption systems, can be expensive and cumbersome to operate, and can result in low consumer participation because of distribution and redemption problems.  Id., col. 2, ll. 24-56.

According to the specification, the introduction of digital computers and computer networks has eliminated "some of the inconveniences of conventional incentive programs, particularly those that relate to data tracking and manipulation."  '830 patent, col. 2, ll. 57-60.  Although acknowledging that computers have been used in connection with incentive programs in the past, the specification asserts that known computer incentive programs "address some, but not all of the drawbacks of traditional promotions."  Id., col. 2, line 64, to col. 3, line 1.   In particular, the specification states, computer-based systems have been used to merge information for various promotions and to track consumer participation in incentive programs.  Id., col. 3, line 3, through col. 4, line 9.    However, according to the specification, "none of the existing systems address all of the problems inherent in known incentive programs, particularly the problem of the need for an incentive program system that conveniently tracks participation while offering automated generation of incentive programs and automated fulfillment of awards won in incentive programs."  Id., col. 4, ll. 11-16.

The specification also acknowledges that computerized incentive programs are offered on the Internet, but it asserts that such systems "are generally offered by a single sponsor and are generally limited to offering consumers the ability to participate in incentive programs," while

not offering sponsors "the ability to conveniently generate incentive programs, to track participation of consumers in multiple incentive programs, or to provide for automated fulfillment of awards." Id., col. 4, ll. 17-24.  Such systems, according to the specification, also lack efficient means for fulfilling awards promised in promotional campaigns. Id., col. 4, ll. 25-32.  In summary, the specification states that the prior art did not satisfy the need for an incentive program and award fulfillment system "that provides easy access to consumers who have standard computer hardware and software, that permits sponsors to build or purchase incentive programs easily and efficiently, and that provides for convenient tracking of participation and convenient, automated award fulfillment." Id., col. 5, ll. 37-43.

The advantages of the patented invention, according to the specification, are that it provides "consumer access to expanded incentive programs, using a conventional computer"; it permits "sponsors to build, buy, store, modify, offer, track and administer incentive programs"; and it permits sponsors and retailers "to offer improved award fulfillment for participants in incentive programs." '830 patent, col. 5, ll. 47-54.  The specification touts the Internet's "increased processing power and ability to access remote users" who have "standard equipment such as a personal computer, without requiring specific hardware or software" and its "dynamic opportunities to transmit, store and retrieve data, so that new or different incentive programs may be conducted on a much more frequent basis than is the case with traditional paper systems." Id., col. 5, ll. 55-65.  According to the specification, the invention permits consumers to participate in incentive programs by connecting to a website located on a server of a host system. Id., col. 6, ll. 1-5.  It also permits sponsors "to list incentive programs on an Internet site, to obtain pre-packaged incentive programs from a host, to build incentive programs using computer software

6

provided by the host, to associate prizes with incentive programs offered through the site, and to fulfill awards won by consumers." Id., col. 6, ll. 13-19.  In addition, the invention envisions the creation of databases of items that permit automated fulfillment of specific items as incentive rewards. Id., col. 6, at 24-27, 40-45.

## II. DISCUSSION

Safeway argues that the asserted claims of the '830 patent are directed to an abstract concept—the idea of conducting inventive programs and fulfilling the awards in those programs through the use of general purpose computers and networks such as the Internet.  The claims are therefore invalid under 35 U.S.C. §101, according to Safeway, because they fail to recite patent-eligible subject matter.

Section 101 provides that "[w]hoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title."  The Supreme Court has interpreted section 101 to bar the issuance of patents on "laws of nature, physical phenomena, and abstract ideas." Diamond v. Chakrabarty, 447 U.S. 303, 308 (1980).  Safeway contends that Kroy's claims are unpatentable because they are drawn to the abstract idea of using incentive award programs to promote sales.  Reciting the use of computers to implement that abstract idea does not rescue Kroy's claims, Safeway argues, because "[u]sing a computer to apply the ancient idea of incentivizing a customer to buy more products through awards and prizes does not turn a basic business method into patentable subject matter."  Dkt. No. 140, at 1-2.

7

### A.  Patentable Subject Matter Under 35 U.S.C. § 101

Over the past several years, as a result of a series of decisions from the Supreme Court and the Federal Circuit, the law of unpatentable subject matter has developed to the point that it is possible to discern a number of governing principles applicable to cases such as this one.  The Supreme Court's decisions in Bilski v. Kappos, 130 S. Ct. 3218 (2010), Mayo Collaborative Services v. Prometheus Laboratories, Inc., 132 S. Ct. 1289 (2012), and Alice Corp. Pty. Ltd. v. CLS Bank International, 134 S. Ct. 2347 (2014), deserve particularly close attention in determining whether the patent in this case is directed to unpatentable subject matter under section 101.

### 1.  Recent Supreme Court Decisions

### a.  Bilski

In Bilski, the Supreme Court addressed the patentability of an invention claiming a method for buyers and sellers of commodities to hedge against the risk of price fluctuations.  As the Court explained, claim 1 of the application at issue in Bilski described a series of steps instructing how to hedge against risk, and claim 4 put the concept articulated in claim 1 into a simple mathematical formula.  Claim 1 in Bilski provided as follows:

> (a) initiating a series of transactions between said commodity provider and consumers of said commodity wherein said consumers purchase said commodity at a fixed rate based upon historical averages, said fixed rate corresponding to a risk position of said consumers;
> (b) identifying market participants for said commodity having a counter-risk position to said consumers; and
> (c) initiating a series of transactions between said commodity provider and said market participants at a second fixed rate such that said series of market participant transactions balances the risk position of said series of consumer transactions.

130 S. Ct. at 3223-24.

The Supreme Court characterized the claims in Bilski as efforts to patent "both the concept of hedging risk and the application of that concept to energy markets."  130 S. Ct. at 3229.  Applying principles drawn from several of its prior decisions, the Court held that the inventions claimed in Bilski "are not patentable processes because they are attempts to patent abstract ideas.  Id. at 3229-30.  The Court pointed out that the basic concept of hedging, or protecting against risk, is a fundamental economic practice long prevalent in our system of commerce and taught in any introductory finance class; as such, the Court held, it "is an unpatentable abstract idea."  Id. at 3231.  "[A]llowing a party to patent the principle of risk hedging, the court explained, would pre-empt use of this approach in all fields, and would effectively grant a monopoly over an abstract idea."  Id.

The Court added that the prohibition against patenting abstract ideas "'cannot be circumvented by attempting to limit the use of the formula to a particular technological environment' or by adding 'insignificant postsolution activity.'"  130 S. Ct. at 3230, quoting Diamond v. Diehr, 450 U.S. 175, 191-92 (1981).  Accordingly, after holding the two principal claims to be unpatentable because they were drawn to the basic concept of hedging, the Court held that the remaining claims were merely examples of "how hedging can be used in commodities and energy markets," and were therefore also unpatentable.  "[L]imiting an abstract idea to one field of use or adding token postsolution components," the Court explained, "did not make the concept patentable."  130 S. Ct. at 3231.

The Bilski Court addressed the "machine-or-transformation" test that the Federal Circuit had relied on to determine whether a claim was drawn to a patentable process.  The Court held that the machine-or-transformation test, which asks whether the process at issue "is tied to a

particular machine or apparatus or it transforms a particular article into a different state or thing," 130 S. Ct. at 3225, is a "useful and important clue" in determining whether some claimed inventions are patentable under section 101, but is "not the sole test for deciding whether an invention is a patent-eligible 'process.'" Id. at 3227.

### b. **Mayo**

In Mayo, decided two years after Bilski, the Supreme Court revisited the issue of patentable subject matter.  The claims in Mayo were directed to methods of optimizing the therapeutic efficacy of certain treatment protocols for an immune-mediated gastrointestinal disorder.  The claims were embodied in certain diagnostic tests, and the patentee claimed that the unlicensed use of those tests infringed the claims.  The method recited in the claims included the steps of administering a particular form of the drug thiopurine to a patient, determining the amount of the drug in the patient, and then, if the drug was present in the patient's red blood cells in less than a particular concentration, concluding that the amount of the drug given to the patient should be increased, while if the drug was present in the patient's red blood cells in more than a particular concentration, concluding that the amount of the drug given to the patient should be reduced.

The Supreme Court held that the claims in Mayo were unpatentable under 35 U.S.C. § 101.  The Court began with the proposition that the claims were drawn to laws of nature— "namely, relationships between concentrations of certain metabolites in the blood and the likelihood that a dosage of a thiopurine drug will prove ineffective or cause harm."  132 S. Ct. at 1296.  The question to be decided, as the Court described it, was "whether the claims do significantly more than simply describe these natural relations."  That is, "do the patent claims

10

add <u>enough</u> to their statements of the correlations to allow the processes they describe to qualify as patent-eligible processes that <u>apply</u> natural laws?"  <u>Id.</u> at 1297 (emphases in original).  The Court held that they did not.  Instead, the Court held, the steps in the claimed processes, other than the natural laws themselves, "involve well-understood, routine, conventional activity previously engaged in by researchers in the field."  <u>Id.</u> at 1294.

Although the technology in <u>Mayo</u> was quite different from the technology at issue in this case, the <u>Mayo</u> case nonetheless bears significantly on this case in several respects.  First, the Court restated the point made in <u>Bilski</u> that the fact that an abstract idea (like a natural law) is limited to a particular "field of use" or added "token postsolution components" does not make the concept patentable.  132 S. Ct. at 1301.  Second, the Court stated that merely implementing an abstract idea, such as a mathematical principle, "on a physical machine, namely a computer," is not a patentable application of that principle.  <u>Id.</u>  Third, the Court emphasized that the risk of preempting later inventive contributions—a risk that underlies the policy against allowing patents on abstract ideas or laws of nature—is not avoided simply because the abstract ideas or laws of nature at issue "are narrow laws that may have limited applicability."  <u>Id.</u> at 1302.  Finally, discussing the line between natural laws and the patentable inventions that employ those natural laws, the Court noted that a process that focuses upon the use of a natural law must "contain other elements or a combination of elements, sometimes referred to as an 'inventive concept,' sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the natural law itself."  <u>Id.</u> at 1294.

### c. **Alice**

Four years after <u>Bilski</u> and two years after <u>Mayo</u>, the Supreme Court again returned to the issue of unpatentable subject matter in <u>Alice</u>.  The <u>Alice</u> case was similar in many respects to <u>Bilski</u>, with the important difference that <u>Alice</u> involved claims to methods and systems of doing business implemented on a computer.

The claims at issue in <u>Alice</u> were drawn to a computerized system for mitigating "settlement risk," i.e., the risk that only one party to an agreed-upon financial exchange will fail to satisfy its obligation.  As the Court explained, the claims were "designed to facilitate the exchange of financial obligations between two parties by using a computer system as a third-party intermediary."  <u>Alice</u>, 134 S. Ct. at 2352.  The claims involved "a method of exchanging financial obligations between two parties using a third-party intermediary to mitigate settlement risk.  The intermediary creates and updates 'shadow' records to reflect the value of each party's actual accounts held at 'exchange institutions,' thereby permitting only those transactions for which the parties have sufficient resources.  At the end of each day, the intermediary issues irrevocable instructions to the exchange institutions to carry out the permitted transactions."  <u>Id.</u> at 2356.

The <u>Alice</u> Court began by noting that <u>Mayo</u> had constructed a two-step framework for determining patent eligibility for claims challenged under section 101 as based on abstract ideas.  First, the Court explained, "we determine whether the claims at issue are directed to one of those patent-ineligible concepts [including an abstract idea].  If so, we then ask '[w]hat else is there in the claims before us?'  To answer that question, we consider the elements of each claim both individually and as an ordered combination to determine whether the additional elements

transform the nature of the claim into a patent-eligible application.  We have described step two of this analysis as a search for an inventive concept—i.e., an element or combination of elements that is 'sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself." 134 S. Ct. at 2355 (citations and quotation marks omitted).

The Supreme Court held that the claims before it in <u>Alice</u> were drawn to the abstract idea of intermediated settlement.  Like risk hedging in <u>Bilski</u>, the Court held that intermediated settlement is a fundamental economic practice that qualifies as an "abstract idea" and thus is beyond the scope of 35 U.S.C. § 101.  134 S. Ct. at 2356.  Both concepts, the Court held, "are squarely within the realm of 'abstract ideas' as we have used that term." <u>Id.</u> at 2357.  Quoting <u>Mayo</u>, the Court explained that "[s]imply appending conventional steps, specified at a high level of generality" is not enough to supply an inventive concept. <u>Id.</u>

On one important issue, the facts of <u>Alice</u> required the Court to go beyond <u>Bilski</u>.  The claims in <u>Bilski</u> did not require the use of computers, while the claims in <u>Alice</u> did.  Significantly, the Court held that introducing the use of a computer into the claims did not render the claims in <u>Alice</u> patentable.  To the contrary, "the mere recitation of a generic computer cannot transform a patent-ineligible abstract idea into a patent-eligible invention." 134 S. Ct. at 2358.  The relevant question, the Court explained, "is whether the claims here do more than simply instruct the practitioner to implement the abstract idea of intermediated settlement on a generic computer." <u>Id.</u> at 2359.  The Court concluded that they did not, because the function performed by the computer at each step of the claims was "purely conventional," <u>id.</u>, quoting <u>Mayo</u>, 132 S. Ct. at 1298.  As the Court explained, the claims before it did not "purport to improve the functioning of the computer itself, [nor did] they effect an improvement in any other

technology or technical field. . . .   Instead, the claims at issue amount to nothing significantly more than an instruction to apply the abstract idea of intermediated settlement using some unspecified, generic computer," which the Court held was not enough to render the abstract idea patentable.  Id. at 2360 (quotation marks and citation omitted).

### 2.  Recent Federal Circuit Precedents

### a.  Ultramercial

The Federal Circuit has applied the guidance from Bilski, Mayo, and Alice in a number of cases, several of which have set forth principles that are pertinent to this case.  The Federal Circuit case that is perhaps most directly applicable to this one is Ultramercial, Inc. v. Hulu, LLC, 772 F.3d 709 (Fed. Cir. 2014).  That case involved a patent on a method of distributing copyrighted media products over the Internet.  The claimed method provided that a consumer would receive a copyrighted media product for free, in exchange for viewing an advertisement, and the advertiser would pay for the copyrighted content.  The claim addressed by the court divided the method into 11 steps that recited the process in detail, from the receipt of the copyrighted materials from the content provider, through the sale of the product at an Internet site, through the display of the advertising to the customer (after which the customer is offered access to the product), and finally to the receipt of payment from the sponsor of the advertising message.

The Federal Circuit had previously held the claims in Ultramercial to be patent-eligible, see Ultramercial, Inc. v. Hulu, LLC, 657 F.3d 1323 (Fed. Cir. 2011), vacated and remanded, 132 S. Ct. 2431 (2012); Ultramercial, Inc. v. Hulu, LLC, 722 F.3d 1335 (Fed. Cir. 2013), vacated and remanded, 134 S. Ct. 2870 (2014).  However, in its most recent opinion in Ultramercial, issued

after the Supreme Court remanded the case for reconsideration in light of Alice, the Federal Circuit held that the claims in Ultramercial were directed to unpatentable subject matter. Following the analytical path set out in Mayo and Alice, the Ultramercial court first held that the recited method was directed to an abstract idea.  The court explained that "receiving copyrighted media, selecting an ad, offering the media in exchange for watching the selected ad, allowing the consumer access to the media, and receiving payment from the sponsor of the ad all describe an abstract idea, devoid of a concrete or tangible application."  772 F.3d at 715.  Focusing on the additional limitations in the claims, the court noted that most of them simply described "the abstract idea of showing an advertisement before delivering free content."  Id.  As to other limitations, the court ruled that "the addition of merely novel or non-routine components to the claimed idea [does not] necessarily turn[] an abstraction into something concrete."  Rather, the court explained, "any novelty in implementation of the idea is a factor to be considered only in the second step of the Alice analysis."  Id.

Addressing that second step, the court considered whether the claims contained "'an inventive concept' to 'transform' the claimed abstract idea into patent-eligible subject matter." 772 F.3d at 715.  The limitations of the patent in suit, the court found, "do not transform the abstract idea that they recite into patent-eligible subject matter because the claims simply instruct the practitioner to implement the abstract idea with routine, conventional activity."  Id. Addressing the 11 steps set forth in the claim, the court held that they constituted merely "routine additional steps such as updating an activity log, requiring a request from the consumer to view the ad, restrictions on public access, and use of the Internet," which were not sufficient to "transform an otherwise abstract idea into patent-eligible subject matter."  Id. at 716.  "That

15

some of the eleven steps were not previously employed in this art is not enough—standing alone—to confer patent eligibility upon the claims at issue." Id. (citations omitted).

Finally, the court looked to the "machine or transformation" test that the Supreme Court in Bilski said was an "important clue" in determining whether some inventions are patent eligible under section 101, Bilski, 561 U.S. at 604.  The claims of the patent at issue were not directed to a machine, within the meaning of that test, because they were "not tied to any particular novel machine or apparatus, only a general purpose computer."  772 F.3d at 716.  The limitations relating to the Internet and to the addition of a general purpose computer to otherwise conventional steps were not sufficient to make an invention patent-eligible.  Id.  Moreover, the court stated, a transaction such as the one at issue in that case, involving "manipulations of 'public or private legal obligations or relationships, business risks, or other such abstractions cannot meet the [transformation] test because they are not physical objects or substances, and they are not representative of physical objects or substances.' . . .  We therefore hold that the claims of the [patent at issue] do not transform any article to a different state or thing."  Id. at 717 (citation omitted).  Accordingly, the court concluded that the patent claims were directed to "no more than a patent-ineligible abstract idea."  Id.

### b.  **Content Extraction**

A month after the decision in Ultramercial, the Federal Circuit again addressed the application of section 101 in a case involving a patent to a computerized business method, and again it held that the claims were not patent eligible.  That case, Content Extraction & Transmission LLC v. Wells Fargo Bank, 776 F.3d 1343 (Fed. Cir. 2014), involved patents to a method of extracting data from hard copy documents using an automated digitizing unit such as

a scanner, recognizing specific information from the extracted data, and storing that information in a memory.  The method could be used, for example, in an automated teller machine that recognizes information on a scanned check.

Summarizing the doctrine of "abstract ideas" as applied to business method patents, the court in Content Extraction acknowledged that there is "no categorical business-method exception," but noted that "claims directed to the mere formation and manipulation of economic relations may involve an abstract idea. . . .  We have also applied the Supreme Court's guidance to identify claims directed to the performance of certain financial transactions as involving abstract ideas."  776 F.3d at 1346.  The Content Extraction court held that the claims before it were drawn to the abstract idea of collecting data, recognizing certain data within the collected data set, and storing that recognized data in memory.  The concept of data collection, recognition, and storage, the court noted, are well known and have long been performed by humans.  The plaintiff first argued that the claims were not directed to abstract ideas because they required not only a computer but a scanner, and because a human could not process the stream of bits output from a scanner and could not recognize the data contained in that stream of bits.  Based on Alice, the court rejected that argument, and held that claims were drawn "to the basic concept of data recognition and storage."  Id. at 1346-47.

For the second step of its analysis, the court looked to whether the limitations present in the claims represented a patent-eligible application of the abstract idea, i.e., whether the claims involved "more than performance of 'well-understood, routine, [and] conventional activities previously known to the industry.'"  776 F.3d at 1347-48, quoting Alice, 134 S. Ct. at 2359.  The court held that they did not.  It noted that the claims merely recited the use of existing scanning

and processing technology to recognize and store data from specific data fields, and that there was nothing inventive about the plaintiff's "use of a generic scanner and computer to perform well-understood, routine and conventional activities."  776 F.3d at 1348.  The use of those components in a particular technological environment was insufficient to save the claims from invalidation.  Id.  Because "the basic character of [the plaintiff's] claims is the abstract idea of extracting and storing data from hard copy documents using generic scanning and processing technology," the court held the patents invalid.  Id. at 1349.

### c. **buySAFE**

In buySAFE, Inc. v. Google, Inc., 765 F.3d 1350 (Fed. Cir. 2014), another post-Alice decision, the Federal Circuit again held a computer-implemented invention to be unpatentable, based on the Supreme Court's "abstract idea" jurisprudence.  The claims at issue in buySAFE recited a method in which the provider of a safe transaction service would receive a request for a performance guarantee for an online commercial transaction, and a computer would process the request by underwriting the requesting party and offering a transaction guaranty that would be binding upon the closing of the transaction.

Citing Mayo, the buySAFE court stated that an abstract idea is unpatentable even if the abstract idea is narrow.  765 F.3d at 1350.  Moreover, quoting both Alice and Mayo, the court explained that a claim that is directed to an abstract idea is unpatentable unless "additional elements" of the claim supply "an 'inventive concept' in the physical realm of things and acts—a 'new and useful application' of the ineligible subject matter in the physical realm—that ensures that the patent is on something 'significantly more than' the ineligible subject matter itself."  Id.

Addressing the question of what constitutes "an abstract idea," the court pointed out that the relevant Supreme Court cases found an abstract idea "in certain arrangements involving contractual relations, which are intangible entities." 765 F.3d at 1350. Moreover, those cases relied on the fact that in each instance the abstract idea constituted "a fundamental economic practice long prevalent in our system of commerce." Id. at 1354. The court in buySAFE noted that the claims before it "were squarely about creating a contractual relationship—a 'transaction performance guaranty'—that is beyond question of ancient lineage." Id. at 1355. As such, the court held, the claims were plainly directed to abstract ideas.

The court then turned to the second question: what constitutes "enough extra" for a "business method" to pass muster under section 101? The court stated that it was not enough that the claim limited the abstract idea "to a particular technological environment." 765 F.3d at 1354-55. Nor did the invocation of computers add any inventive concept to the claims, as the recited computer functionality was "quite generic." Id. The court further concluded that it "cannot be enough that the transactions being guaranteed are themselves online transactions." At best, the court explained, that narrowing is "an 'attempt to limit the use of the abstract guarantee idea to a particular technological environment,' which has long been held insufficient to save a claim in this context." Id. Finally, the fact that the dependent claims narrowed the invention "to particular types of such relationships, themselves familiar," did not change the analysis, because that kind of narrowing "of such long-familiar commercial transactions does not make the idea non-abstract for section 101 purposes." 765 F.3d at 1355.

### d.  <u>Accenture</u>

<u>Accenture Global Services, GmbH v. Guidewire Software, Inc.</u>, 728 F.3d 1336 (Fed. Cir. 2013), involved claims to a computerized system and method for generating tasks to be performed in conducting insurance transactions.  The invention provided for the computer to store information about insurance transactions in a database and then, upon the occurrence of an event relating to the insurance, to determine what tasks need to be accomplished for the transaction at issue, and to assign those tasks to various individuals to complete them.

In response to a claim that the invention was patent-ineligible, Accenture argued that the patent implemented the general idea of generating tasks for insurance claim processing, "but narrows it through its recitation of a combination of computer components including an insurance transaction database, a client component, and a server component, which includes an event processor, a task engine, and a task assistant."  728 F.3d at 1344.  Accenture also argued that the complexity and detail of the specification demonstrated that the patent embodied an advance in computer software and not simply a claim to an abstract idea.

The Federal Circuit rejected those arguments and held the claims unpatentable.  The court first held that the "abstract idea at the heart" of the claimed invention is "generating tasks [based on] rules . . . to be completed upon the occurrence of an event."  728 F.3d at 1344.  The court then rejected Accenture's arguments that the claims imposed meaningful limitations on that abstract idea sufficient to find the invention patentable.  First, the court rejected Accenture's arguments that the abstract idea was limited by being applied in a computer environment and within the insurance industry.  The court held that simply implementing an abstract idea on a computer does not transform a patent-ineligible claim into a patent-eligible one, and that limiting

20

the application of the idea to a single field of use did not render it patentable.  Second, with respect to Accenture's argument concerning the complexity of the specification and the detailed software implementation guidelines found in the specification, the court explained that "the important inquiry for a § 101 analysis is to look to the claim." Id. at 1345.  The court noted that although the specification contained "very detailed software implementation guidelines, the system claims themselves only contain generalized software components arranged to implement an abstract concept on a computer. . . .  [T]he complexity of the implementing software or the level of detail in the specification does not transform a claim reciting only an abstract concept into a patent-eligible system or method." Id.

### e. **Bancorp Services**

In Bancorp Services, L.L.C. v. Sun Life Assurance Co., 687 F.2d 1266 (Fed. Cir. 2012), the claims at issue were drawn to methods and systems for tracking the value of insurance policies by computer.  The court observed that the recited computer functions were simply basic digital computations that were interchangeable with mental processes that could be performed, albeit less efficiently, by humans. Id. at 1278.  That was not sufficient to make the claims patent eligible.  "To salvage an otherwise patent-ineligible process," the court said, "a computer must be integral to the claimed invention, facilitating the process in a way that a person making calculations or computations could not. . . .  [The computer] must play a significant part in permitting the claimed method to be performed, rather than function solely as an obvious mechanism for permitting a solution to be achieved more quickly." Id., quoting SiRF Tech., Inc. v. Int'l Trade Comm'n, 601 F.3d 1319, 1333 (Fed. Cir. 2010).

The Bancorp court distinguished the prior case of Research Corp. Techs., Inc. v. Microsoft Corp., 627 F.3d 859 (Fed. Cir. 2010).  The patent in that case claimed a process for enabling a computer to render a halftone image of a digital image by comparing the digital image, pixel by pixel, against a two-dimensional array called a mask.  687 F.3d at 1279.  The Bancorp court explained that the patent in Research Corp. "represented improvements to computer technologies in the marketplace," which constituted "a technological advance"; it did not simply entail employing computers to track, reconcile, and administer a life insurance policy, thus using a computer to perform more efficiently what could otherwise be accomplished manually.  Id.  The court added that the method in Research Corp. required the manipulation of computer data structures (the pixels of a digital image and the mask), and the output of the modified computer data structure was dependent upon the computer components that were required to perform it.  Id.

### f. **DDR Holdings**

A case that helps define the limits of the doctrine of unpatentable abstract ideas is DDR Holdings, LLC v. Hotels.com, L.P., 773 F.3d 1245 (Fed. Cir. 2014).  The claims in that case recited systems used to enable host websites to avoid losing visitors when those visitors click on an advertisement on the host site.  Instead of directing the visitor to the advertiser's website, the claimed invention provided for the host to serve a composite web page to the visitor computer having the "look and feel" of the host web page, along with content based on product information from the advertiser's product catalog.

The Federal Circuit held that the patents were not invalid under section 101.  The court distinguished the case before it from cases such as Ultramercial, buySAFE, and Bancorp on

several grounds.  First, it noted that the claims did not embody a fundamental economic principle or longstanding commercial practice.  Rather, it noted, the challenge of retaining website visitors is one "particular to the Internet."  773 F.3d at 1257.  Moreover, the court held that the claimed solution does not simply use computers to serve a conventional business purpose; instead, it "is necessarily rooted in computer technology in order to overcome a problem specially arising in the realm of computer networks."  Id.  The invention entails the storage of visually perceptible elements of numerous websites and the construction of new, hybrid web pages that "merge the content associated with the products of the third-party merchant with the stored 'visually perceptible elements' from the identified host website."  Id.  The court distinguished Ultramercial on the ground that the claims in the DDR Holdings case did not "broadly and generically claim 'use of the Internet' to perform an abstract business practice," but instead specified "how interactions with the Internet are manipulated to yield a desired result."  Id. at 1258.  Moreover, the court observed that the claims at issue included a specific way to automate the creation of a composite web page and did not preempt "every application of the idea of increasing sales by making two web pages look the same."  Id. at 1259.  In short, DDR Holdings dealt with a patent that required doing something to a web page, not simply doing something on a web page, a difference that the court regarded as highly important to the issue of patent eligibility.

### 3.  Recent District Court Decisions

In the wake of the Supreme Court's decisions in Bilski, Mayo, and Alice—and particularly Alice—district courts have decided a number of cases involving challenges under section 101 to patents involving computer implementations of methods of doing business.  In the

great majority of those cases, the courts have held the claims unpatentable, either on summary judgment or on motions to dismiss under Fed. R. Civ. P. 12(b)(6) or 12(c), based on the Supreme Court's two-part test adopted in <u>Mayo</u> and <u>Alice</u>.  The decisions are too numerous to discuss individually, but those dealing with business methods in the field of marketing are instructive, as the subject matter of those cases relates closely to that of the inventions at issue in this case.

In each of the district court cases dealing with computerized business methods in the field of marketing, the courts have held the claims patent-ineligible after finding that the claimed computerized activities involved actions that had previously been performed, albeit less efficiently, without the aid of computers.  Those cases involve, for example, a computerized method for conducting business transactions over the Internet that allows the buyer to reduce the price of an item by participating in an auction and a competitive activity, <u>Priceplay.com, Inc. v. AOL Advertising, Inc.</u>, Civil Action No. 14-92, 2015 WL 1246781 (D. Del. Mar. 18, 2015); a computer-implemented method of generating a customized proposal for selling equipment to particular customers by obtaining and storing specialized information about the equipment and the customers' needs, <u>Clear With Computers, LLC v. Altec Indus., Inc.</u>, Case No. 6:14-cv-79 (E.D. Tex. Mar. 3, 2015); a method of allowing advertisers to target online advertising to consumers fitting desired demographic, geographic, and psychographic criteria, <u>Morsa v. Facebook, Inc.</u>, Case No. SACV 14-161, 2014 WL 7641155 (C.D. Cal. Dec. 23, 2014); a telemarketing system that allows an agent to use a mixture of prerecorded scripts and live voice to selectively respond to customers and to use personal information to select scripts relating to the customer, <u>KomBea Corp. v. Noguar L.C.</u>, Case No. 2:13-cv-957, 2014 WL 7359049 (D. Utah Dec. 23, 2014); a method to "upsell" consumers by using information about the consumer,

including information about the consumer's purchases, to offer additional items to the consumer,
Tuxis Techs., LLC v. Amazon.com, Inc., Civil Action No. 13-1771. 2014 WL 4382446 (D. Del.
Sep. 3, 2014); and a computer program that allows the user to create meals from a database of
food objects according to the purchaser's preferences and dietary goals, DietGoal Innovations
LLC v. Bravo Media LLC, No. 13 Civ. 8391, 2014 WL 3582914 (S.D.N.Y. July 8, 2014).

The courts in each of those cases found the marketing concept underlying the patent to be
an "abstract idea" that had previously been employed in marketing and was simply being
"updated" by the use of computers or the Internet.  After finding no "inventive concept"
sufficient to render the abstract idea patentable, the courts in each of those cases held that the
claimed inventions were drawn to unpatentable subject matter.

### B.  Applying the Governing Section 101 Precedents to This Case

The claimed systems and methods of the '830 patent are drawn to the use of generic
computers and familiar computer networks, such as the Internet, in constructing and operating
incentive award programs.  '830 patent, col. 1, ll. 23-28.  The core idea of the '830 patent—
providing a computer-based incentive award program—is plainly an unpatentable abstract idea
by itself.  Incentive award programs designed to encourage sales of products and services have
been familiar aspects of marketing for many years, as the '830 patent itself acknowledges.  See
'830 patent, col. 1, ll. 30-33 ("Incentive award programs, in which incentive companies contract
with sponsoring companies for programs to promote sales of the sponsoring companies' products
or services, are well-known.").  The patent further notes that incentive award programs have
traditionally offered "awards and incentives to modify behavior of individual consumers and to
direct the consumers to some pre-determined action, such as purchase of products or services

upon visiting a retail site, viewing advertising, testing a product, or the like." '830 patent, col. 1, ll. 39-43. Using a computer and a computer-based network to provide and operate such an incentive award program does not render the idea any less abstract or any more patentable. See Alice, 134 S. Ct. 2358-60.

The use of incentive award programs in marketing is indistinguishable in principle from the kinds of financial or business operations that were at issue in Bilski and Alice, as well as similar financial or business operations that were at issue in various Federal Circuit decisions in which the claims have been held patent-ineligible under section 101. See buySAFE, 765 F.3d 1350 (guaranty service for on-line transactions); Accenture, 728 F.3d 1336 ("system for generating tasks to be performed in an insurance organization"); Bancorp, 687 F.3d 1266 (method for managing a life insurance policy, including generating the policy, calculating fees, and determining the surrender value and investment value of the policy); Dealertrack, Inc. v. Huber, 674 F.3d 1315 (Fed. Cir. 2012) (method for processing credit applications); Fort Properties, Inc. v. Am. Master Lease LLC, 671 F.3d 1317 (Fed. Cir. 2012) (method for creating a real estate investment instrument adapted for performing tax-deferred exchanges).

Kroy does not have any convincing answer to Safeway's contention that using incentive programs in marketing is an abstract idea, as the Supreme Court has used that term in Bilski and Alice. Kroy argues, instead, that its invention is far more than the simple abstract idea of an incentive award program, and that its invention has solved problems relating to incentive award programs that had never been solved before.

Kroy contends that the various narrowing limitations recited in the claims of the '830 patent distinguish the claimed incentive award programs from the kinds of abstract ideas that

26

were before the courts in the cases cited above.  In fact, however, while the additional limitations set forth in the '830 claims may make those claims narrower, they don't make them any less abstract.  As the Federal Circuit explained in Ultramercial, the addition of novel or non-routine components to an abstract idea do not necessarily "turn an abstraction into something concrete." 772 F.3d at 715.  Rather, any novelty in implementation of the idea is a factor to be considered only in the second step of the Alice decision."  Id.

In substance, then, Kroy's arguments are directed mainly at the second step of the Supreme Court's analysis in Mayo, which asks whether the claims contain "an inventive concept" sufficient "to transform the claimed abstract idea into a patent eligible application." Alice, 134 S. Ct. at 2357, quoting Mayo, 132 S. Ct. at 1294.  However, a careful examination of Kroy's arguments and the evidence it has offered in opposition to Safeway's summary judgment motion reveals that the claims contain no such "inventive concept."  The various components of Kroy's argument are addressed separately below.

### 1. The Use of Computers and the Internet

Although Kroy emphasizes the importance of the use of computers in its invention, the fact that the claimed system and methods employ computers or a network such as the Internet is clearly insufficient to make the claims patent eligible.  The computers and computer-related features recited in the claims are generic, commonplace components; the claims are not directed to an improvement in computer technology or to the manipulation of a website, as in the DDR Holdings case.  See also Research Corp. Techs., Inc. v. Microsoft Corp., 627 F.3d 859 (Fed. Cir. 2010) (claim to a process for enabling a computer to render a halftone image of a digital image is patent eligible because it represented an improvement to computer technology, not simply the

27

use of computers to perform some conventional function more efficiently).  Instead, the role of computers in the '830 claims is directly comparable to the role of computers in many cases in which the claims have been held unpatentable, including Alice, Ultramercial, Content Extraction, buySAFE, Bancorp, and Accenture.  As the Supreme Court explained in some detail in Alice, the introduction of a generic computer does not render an invention patentable if, absent the use of a computer, it would not have been.  134 S. Ct. at 2357-59.

Those cases, according to the Alice Court, "demonstrate that the mere recitation of a generic computer cannot transform a patent-ineligible abstract idea into a patent-eligible invention."  134 S. Ct. at 2358.  "Given the ubiquity of computers, . . . wholly generic computer implementation is not generally the sort of 'additional featur[e]' that provides any 'practical assurance that the process is more than a drafting effort designed to monopolize the [abstract idea] itself.'"  Id., quoting Mayo, 132 S. Ct. at 1297.

That analysis applies directly to the claims in this case.  The role of the computer in the claims of the '830 patent is limited to the basic functions of a generic computer, including storing, transmitting, and displaying information.  Nothing in the claims purports to improve the functioning of the computer itself, and the computer-related elements  of the claim add nothing that is not already present in the steps of the claimed system and methods, other than the speed and convenience of basic computer functions such as calculation, communication, and the display of information.  See Dealertrack, Inc. v. Huber, 674 F.3d at 1333, quoting SiRF Tech., Inc. v. Int'l Trade Comm'n, 601 F.3d 1319, 1333 (Fed. Cir. 2010) ("In order for the addition of a machine to impose a meaningful limit on the scope of a claim, it must play a significant part in permitting the claimed method to be performed, rather than function solely as an obvious

mechanism for permitting a solution to be achieved more quickly, i.e., through the utilization of a computer for performing calculations.").

It is clear that each of the functions that the '830 patent assigns to computers could be performed by a human being without the aid of a computer of any kind.  Thus, humans could operate a simple incentive reward system in conjunction with a simple inventory management system, in which the operator to the system would keep track of his inventory of awards, would select recipients of those awards based on known characteristics (such as their purchasing history), and would select the awards and the location for redeeming them.

Kroy disputes that the claimed functions recited in the '830 claims could be performed by humans.  In making that argument, however, Kroy relies on the presumed volume of information and speed required in large, commercial incentive award programs, which a human armed with only a pencil and paper could not keep up with.  But the claims apply to incentive award programs without regard to their size, and there is no room for doubt that if the incentive program were small, humans could perform each of the tasks that the claims assign to computers without the need for processing assistance.

Computers can, of course, be useful in managing a large volume of transactions, doing so at great speed, and efficiently communicating the results of those transactions to system users. But the basic functions recited in the '830 patent—selecting awards based on consumers' demographic and psychographic preferences, ensuring that those awards are available in inventory, and directing the consumers to a particular location to redeem their awards—all constitute conventional conduct that could be performed by a human being.  The greater efficiency with which the computer can perform tasks that a human could perform does not

render the inventions patentable.  See Bancorp, 687 F.3d at 1278-79; Cybersource Corp. v. Retail Decisions, Inc., 654 F.3d 1366, 1372 (Fed. Cir. 2011) (method steps unpatentable because "they can be performed in the human mind or by a human using a pen and paper"); Planet Bingo LLC v. VKGS LLC, 576 F. Appx. 1005, 1007-08 (Fed. Cir. 2014) (managing a bingo game "can be carried out by a human using pen and paper").  Adding a computer to perform those mental steps "does not transform a patent-ineligible claim into a patent-eligible one."  Accenture Global Servs. GmbH v. Guidewire Software, Inc., 728 F.3d 1336, 1345 (Fed. Cir. 2013); Dealertrack, 674 F.3d at 1333 ("Simply adding a 'computer aided limitation to a claim covering an abstract concept, without more, is insufficient to render the claim patent eligible.").

Kroy attempts to avoid the effect of that line of cases by arguing that this case does not involve generic computers.  Instead, according to Kroy, this case involves novel computing functions.  That argument is wholly unconvincing.  Nothing in the claims or the specification of the '830 patent indicates that specific recited tasks require anything other than generic computers programmed in a conventional method to perform those tasks.  The claims simply recite the conventional computer functions of (1) coupling a host computer to a network, (2) making a database accessible to the host computer, (3) providing a program on the host computer that allows communication with the inventory management systems of a plurality of providers, (4) designating awards selected by the sponsor, and (5) designating the location for redeeming those awards, also selected by the sponsor.  The specification describes, in some detail, the computer components and programs that can perform those functions, but the described computer components and operations are well-known and conventional, frequently identified by their commercial designations.

For example, the specification states that if a consumer wishes to participate in the system, the consumer

> logs on to the consumer computer **12**, which may be any 'client' computer in a client/server system.   The consumer computer **12** includes the CPU **20**, ROM **22**, I/O interface **28**, I/O Device **24**, RAM **40**, modem **54**, and storage device **45**. . . . [T]he operating system **42** is preferably an operating system capable of supporting such an interface, such as WINDSOWS 95, UNIX or the MacIntosh.

'830 patent, col. 22, line 51, through col. 23, line 4.

The apparatus and method that permits a retailer to participate in the host system is described in similar fashion.  '380 patent, col. 37, ll. 19-55.  That description refers to the typical components of the retailer's computer, including standard components present in many computers and what the patent refers to as "any conventional browser."  The specification reads as follows, in pertinent part, referring to the simple flow charts found in the accompanying figures:

> In order to participate in the system, the retailer logs on to the retailer computer **16**, which may be any "client" computer in a client/server system.  The retailer computer **16** may include the typical components of a client computer, as depicted in Fig. **5**, including the CPU **92**, ROM **94**, I/O interface **100**, I/O Device **98**, RAM **102**, modem **124**, and storage device **109**.   The retailer computer **16** further includes the operating system **42**, which controls the applications running on the retailer computer **16**, such as the data management, storage and retrieval application **44**, the web browser **50**, the communications application **52**, and the other applications.   The retailer computer **16** is preferably equipped with a graphical user interface, permitting the user to click on icons, buttons, highlighted text, or the like in order to initiate functions.  Thus, the operating system **42** is preferably an operating system capable of supporting such an interface, such as WINDOWS 95, or the MacIntosh.  The retailer computer **16** is connected by the modem **124** to the telecommunications connection **38** of a network, which may be the Internet, an intranet, or any other computer network.
>
> In order to participate, the retailer logs onto the retailer computer **16** and initiates the web browser **50**, which may be any conventional browser, such as NetScape Navigator, Microsoft Explorer, or the like.  Due to the graphical nature of many Incentive program games, the browser is preferably one that supports a graphical user interface.

31

> The browser **50** permits the retailer computer **16** to connect to the host gateway **19** over the telecommunications connection **38**.

'830 patent, col. 37, ll. 21-50.

Thus, nothing in the claims or the specification reveals any novel computing functions, as Kroy alleges.  While Kroy contends that computer functions were employed to perform tasks that had not been performed by computers in the prior art, there is nothing novel or distinctive about the individual tasks that the computer system are described as performing.  Thus, as in Ultramercial, Content Extraction, buySAFE, Accenture, Bancorp and Cybersource, the computers in the claimed system and methods simply perform tasks that could be performed by a human if the scale of the incentive program were small and there were no premium on the speed and efficiency that are typically offered by generic computers.

Citing a passage from the Supreme Court's decision in Bilski, 130 S. Ct. at 3226-27, Kroy makes the same argument in favor of the patentability of the '830 patent under the so-called "machine-or-transformation" test.  That is, Kroy contends that the '830 claims are patentable because the invention involves the use of a machine, in that the claimed system and methods involve computerized operations.  However, as the Supreme Court made clear in Alice, and as this court has repeatedly ruled, the mere use of conventional computer functions as part of a claimed invention does not satisfy the machine-or-transformation test.  Alice, 134 S. Ct. at 2358 ("the mere recitation of a generic computer cannot transform a patent-ineligible abstract idea into a patent-ineligible invention"); Dealertrack, 674 F.3d at 1333 ("Simply adding a 'computer aided' limitation to a claim covering an abstract concept, without more, is insufficient to render the claim patent eligible."); SiRF Tech., Inc. v. Int'l Trade Comm'n, 601 F.3d 1319, 1333 (Fed. Cir. 2010) ("In order for the addition of a machine to impose a meaningful limit on

the scope of a claim, it must play a significant part in permitting the claimed method to be performed, rather than function solely as an obvious mechanism for permitting a solution to be achieved more quickly, i.e., through the utilization of a computer for performing calculations.").

### 2.  The Specificity of the Claims

Kroy emphasizes that its claims are limited to a particular type of incentive award system, and not to incentive award systems generally.  However, the Supreme Court has made clear that the fact that claims are directed to a specific commercial application of an abstract idea does not by itself render them patentable.  In Diamond v. Diehr, 450 U.S. 175, 191-92 (1981), the Supreme Court explained that the prohibition against patenting an abstract idea such as a mathematical formula "cannot be circumvented by attempting to limit the use of the formula to a particular technological environment."  The Court expanded upon that principle in Bilski, where it wrote that "limiting an abstract idea to one field of use . . . did not make the concept patentable."  130 S. Ct. at 3231.  And in Mayo, the Court addressed the same argument.  The patentee in that case argued that "because the particular laws of nature that its patent claims embody are narrow and specific, the patents should be upheld."  Mayo, 132 S. Ct. at 1303.  The Mayo Court rejected that argument, holding that "the underlying functional concern here is a relative one: how much future innovation is foreclosed relative to the contribution of the inventor."  Id.

The claims in this case do not cover all computerized incentive award programs, but only those for multiple providers in which the program communicates with each provider's inventory management system and in which the awards and the location for fulfillment are selected by the sponsor.  Those modest reductions in the scope of the abstract idea of a computerized incentive

program do not render the claims patent eligible, however.  Even with those limitations on the

scope of the abstract idea, the claims would still have sweeping preemptive effects within the

broad category of computerized incentive award programs.

Safeway characterizes the invention in this case as follows:  "[T]he independent claims

are directed to the abstract concept of providing an incentive program whereby a sponsor selects

awards for participants tailored to their preferences, and then fulfills them from a specific

geographic location."  Kroy objects to Safeway's characterization of the invention, contending

that the claims "require much more than that."  In fact, however, the claims do not require much

more than that, as even Kroy's description of the invention makes clear.

Kroy's description of claim 1 is as follows:

[C]laim 1 recites a specific system that requires an automated fulfillment
application program executed on a host computer.  The automated fulfillment
application program must be "in communication with an inventory management
system associated with each of said plurality of providers," must provide
"sponsor-selected fulfillment," must comprise "code adapted to provide a
sponsor-selected specific award unit item" and must comprise "code adapted to
provide a sponsor-selected geographic location for fulfillment."  The "sponsor-
selected specific award item" must be "tailored to demographic and
psychographic preferences of a sponsor-selected consumer user."

Dkt. No. 151, at 1.

Upon close examination, it is apparent that Kroy's description of the invention adds very

little to Safeway's, other than using the more abstract nomenclature employed by the claims.  In

addition to the features identified by Safeway, Kroy points out that the incentive program is

executed on a "host" computer, that the program is "in communication with an inventory

management system" of each of the providers, that the consumers' preferences to which the

awards are tailored are "demographic and psychographic preferences," and that the program

relies on "code adapted to provide a sponsor-selected specific award unit item" and "code adapted to provide a sponsor-selected geographic location for fulfillment."

None of those features adds significantly to the description of the invention offered by Safeway.  The references to "code" and the "host computer" indicate only that the system is computer-based.  The "in communication with an inventory management system" limitation just requires that the incentive award program is connected in some undefined manner with the inventory systems of the providers.  And the reference to tailoring the awards to the demographic and psychographic preferences of consumers simply reflects that the system tailors awards to the characteristics and tastes of consumers, as revealed by information available to the users of the system.

As noted above, the basic concept of an incentive award system is, beyond doubt, an abstract idea, and implementing that idea on computers does not change its nature.  The question is whether, under the second part of the test set forth in Mayo, the particular limitations on which Kroy relies add an "inventive concept" that renders the invention patent-eligible.

The Federal Circuit addressed and rejected an argument similar to Kroy's in its most recent decision in the Ultramercial case.  Like Kroy, the patentee in Ultramercial argued that even if the core concept of the claims was an abstract idea, the claims did significantly more than simply describe the abstract method.  The court accordingly examined the limitations of the claims to determine whether the claims contained "additional features" that embodied "an 'inventive concept' to 'transform' the claimed abstract idea into patent-eligible subject matter." Ultramercial, 772 F.3d at 715, citing Alice, 134 S. Ct. at 2357.  Those "additional features," the

Court stated, "must be more than 'well-understood, routine, conventional activity.'" Id., quoting Mayo, 132 S. Ct. at 1298.

The Ultramercial court concluded that the 11 steps recited in the claim at issue in that case did not transform the claim into patent-eligible subject matter.  "Adding routine additional steps such as updating an activity log, requiring a request from the consumer to view the ad, restrictions on public access, and use of the Internet" was not enough, the court ruled. Ultramercial, 772 F.3d at 716.  "[E]ach of those eleven steps merely instructs the practitioner to implement the abstract idea with 'routine, conventional activit[ies],' which is insufficient to transform the patent-ineligible abstract idea into patent-eligible subject matter."  Id.  Importantly, the court added:  "That some of the eleven steps were not previously employed in this art is not enough—standing alone—to confer patent eligibility upon the claims at issue."  Id.

That passage from Ultramercial applies directly to this case.  The additional limitations on which Kroy relies describe routine, conventional activities that do not embody the "inventive concept" necessary to convert the claim on the abstract idea of a computer-implemented incentive award program into patentable subject matter.

Kroy attaches great weight to the following limitations in claims 1 and 19: (1) requiring that the automated award fulfillment application program be "in communication with an inventory management system associated with each of the plurality of providers," (2) requiring that the program provide for "sponsor-selected fulfillment," including (a) that the specific award unit items be sponsor-selected, (b) that the items be tailored to demographic and psychographic preferences of a sponsor-selected consumer user, and (c) that the geographic location for fulfillment be sponsor-selected.

Those limitations are precisely the kinds of conventional limitations discussed by the Federal Circuit in <u>Ultramercial</u>, and the kinds of "conventional steps, specified at a high level of generality" referred to by the Supreme Court in <u>Mayo</u>, 132 S. Ct. at 1300, and <u>Alice</u>, 134 S. Ct. at 2357.

First, in a computerized incentive award program, it is hardly surprising that the program would provide for communication between the provider's awards and its inventory.  Some kind of communication would be necessary to ensure that prizes are available at the locations where consumers are eligible to redeem them.  The asserted claims do not specify any particular type of communication or any particular type of inventory management system, so any electronic connection between the program and some form of inventory management system run by the retailer, no matter how simple, would suffice.

Second, in an incentive award program, either the customer selects the prize or the party running the program selects the prize.  Having the sponsor of the program select the prize allows the sponsor to maintain control over the program in general and the distribution of prizes in particular.  In any event, even if the consumer makes the ultimate choice of the award, the sponsor or provider will typically have defined the class of awards from which the consumer makes his selection.  Thus, for example, a jewelry store that provides an incentive award program that allows customers to select an award from the store's inventory can ordinarily be expected to limit the universe of permissible choices to certain listed items or to items of up to a certain value, rather than allowing the customer to choose any item in the store, including a $15,000 Rolex watch. The limitation providing that sponsors will select the specific award items chosen as prizes therefore constitutes the kind of "routine, conventional activity" referred to by

the Federal Circuit in <u>Ultramercial</u> and accordingly does not serve as a basis for treating the claims as patentable.[3]

Third, having the sponsor tailor prizes to the characteristics and tastes of those customers who are the targets of the incentive program is conventional practice.  There is nothing unusual about an award program being tailored to demographic and psychographic preferences of consumers.  During claim construction, the Court in this case construed the term "demographic" to refer to objective characteristics of the consumer, such as "sex, marital status, income, occupation, and location."  Dkt. No. 90, at 31.  The Court construed the term "psychographic" preferences to mean "preferences associated with a consumer's attitudes, interests, values, opinions, lifestyles, or behaviors."  <u>Id.</u> at 35.  Behavior includes such factors as prior purchasing history.

The prior art references invoked by Safeway contain discussions of the commonplace practice of using demographic and psychographic characteristics in conducting targeted incentive award programs.  <u>See</u> U.S. Patent No. 5,970,469 ("Scroggie"); U.S. Patent No. 5,822,735 ("DeLapa").  The Scroggie and DeLapa patents both disclose computer-implemented systems for targeting prospective incentive award program participants by reference to demographic and psychographic factors, such as household characteristics and prior purchasing behavior.  In

---

[3]  In its response to Safeway's motion for summary judgment of non-infringement, Kroy argued for a broad construction of the requirement that the specific award unit items be sponsor-selected, contending that it is sufficient to satisfy that limitation if the sponsor makes a variety of award unit items available to the consumer to choose from, even if the consumer makes the ultimate selection from among those choices.  Dkt. No. 162, at 8-9.  The Court agrees with that construction, but the consequence of the Court's adoption of Kroy's proposed construction is that the "sponsor-selected award unit item" limitation applies to a great many incentive award programs and thus would have a broad preemptive effect in the field of computer-implemented incentive award programs.

addition, they note that such targeting practices have frequently been employed before. <u>See</u> Scroggie, col. 1, ll. 16-18; col. 4, ll. 39-50; col. 9,ll. 21-28; col. 12, ll. 7-51; col. 13, ll.10-35; DeLapa, col. 1, l. 35-40, 54-57; col. 3, ll. 29-37; col. 8, ll. 46-60; col. 15, ll. 64-67; col. 19, line 65, through col. 20, line 2.

Finally, it is entirely conventional for a sponsor to select the geographic location for fulfillment, since the sponsor knows where the prizes are available. Sometimes, for example, a retailer may seek to direct traffic to particular stores and therefore offer awards for redemption only at particular locations. <u>See</u> DeLapa, col. 5, ll. 1017 ("focused coupon system" used to induce consumers "to shop at the retailer participating in" the system and "to induce the consumer to the retailer's store"; <u>see also</u> <u>id.</u>, col. 19, ll. 36-38; col. 20, ll. 9-12. There is a reason that the expression "good only at participating locations" has become a familiar legend on award coupons and the like in many lines of commerce.[4]

In sum, each of the limitations set forth in claims 1 and 19 recites routine or conventional activities that would be expected to be associated with a computer-based incentive award program. Because those limitations do not add any "inventive concept" to the claims of the '830

---

[4] In its response to Safeway's motion for summary judgment of non-infringement (and at oral argument on the dispositive motions), Kroy argued for a broad construction of the "sponsor-selected geographic location" limitation. Kroy's position is that it is sufficient for the award to be redeemable at any store operated by a particular company or, at a minimum, at any subset of those stores, such as any store in a particular region, or even all stores operated by that company. Dkt. No. 162, at 14-15. The Court agrees that the "sponsor-selected geographic location" limitation does not require that award fulfillment occur at a single designated location. As in the case of the sponsor-selected award unit item limitation, however, the breadth of Kroy's proposed construction means that the limitation sweeps broadly and would reach, for example, a company coupon even if the coupon were redeemable at any store owned or operated by that company. The preemptive effect of such a limitation, as so construed, would be correspondingly broad.

patent, they do not alter the conclusion that claims 1 and 19 of the '830 patent are directed to an abstract idea and therefore do not recite patentable subject matter.

Kroy spends little time on the asserted dependent claims (20-25) of the '830 patent, and with good reason. Those claims involve trivial variations on method claim 19. As for the claim requiring that the database of awards include awards from a plurality of sponsors (claim 20), there is nothing novel about sponsors of incentive award programs pooling their resources to expand the attractiveness of their reward packages, something that is commonly found, for example, in incentive programs in which airlines allow their miles to be used to obtain hotel rooms or rental cars. See Loyalty Conversion Sys. Corp. v. Am. Airlines, Inc., No. 2:13-cv-655, 2014 WL 4364848 (E.D. Tex. Sept. 3, 2014).

Similarly, it is entirely conventional to associate an award with an incentive program and to associate a fulfillment method with the award (claim 21). That occurs, for example, any time an incentive award program offers a single award, or requires the consumer to visit a particular store in order to claim the award. Likewise, identifying "an award based on the geographic proximity of an award winner to a redemption location of an award in the database of awards" (claim 22) is simply another way of saying that the award winner will be directed to a nearby location to redeem his award.

Finally, three of the asserted dependent claims call for providing a card for storing data associated with a user (claim 23), providing that the stored data is "a personal identification number" (claim 24), and providing that the data is "information relating to a user's participation in said incentive program" (claim 25). Those limitations follow naturally from the practice of issuing cards that allow the holder of the card to participate in incentive award programs. The

prior art patents to Scroggie and DeLapa both contain a discussion of similar systems, including the use of cards with personal identification numbers and providing information that can be used in targeting the customer with particular incentive awards.  Scroggie, col. 4, ll. 33-50; DeLapa, col. 1, ll. 41-57.  The limitations are also found in general use credit cards that allow card owners to win, for example, airline miles or other credits for purchases made with the card.  The dependent claims thus contain no limitations that can fairly be said to contain an "inventive concept" that renders any of those claims patent-eligible.

### 3. The Detail in the Specification

Kroy argues that the disclosure in the lengthy specification gives particularity to the functional claims and thus renders them patentable.  But the Federal Circuit addressed—and rejected—just such an argument in <u>Accenture</u>.  In that case, the patentee argued, as Kroy does here, that the specification's detailed software implementation guidelines buttressed the patentability of the invention.  But the court said no:  "the important inquiry for a § 101 analysis," the court stated, "is to look at the claim."  728 F.3d at 1345.  As the court explained in <u>Accenture</u>:

> Although the specification of the '284 patent contains very detailed software implementation guidelines, the system claims themselves only contain generalized software components arranged to implement an abstract concept on a computer.  The limitations of the system claims of the '284 patent do not provide sufficient additional features or limit the abstract concept in a meaningful way.  In other words, the complexity of the implementing software or the level of detail in the specification does not transform a claim reciting only an abstract concept into a patent-eligible system or method.

<u>Id.</u>; <u>see also</u> <u>Planet Bingo, LLC v. VKGS LLC</u>, 576 F. App'x 1005, 1008-09 (Fed. Cir. 2014) (specification that recites "complex computer code" does not render patentable claims broadly drawn to the use of computers to manage a bingo game).

41

The same analysis applies here.  The patent consists of 26 figures (all flow charts) and 46 columns, not including the claims.  But the claims are very generic in character, providing very little by way of detail as to the architecture of the claimed systems.  And the specification, as noted above, consists mainly of a detailed recitation of the steps of the claims and the commonplace computer components that can be employed in performing those steps; the specification does nothing to narrow the breadth of the claims.

The passages from the specification quoted at pages 29-30 above, which are typical, describe in detail the conventional apparatus used to effect the computer operations such as connecting the retailer's computer to the server and connecting the consumer's computer to a network.  But the lengthy descriptions of those functions in the specification add almost nothing to the claim language other than to describe commonplace computer functions operating in a conventional manner to perform ordinary tasks.

The specification contains some description of the operation of aspects of the invention, such as the connection between the award fulfillment application program and the providers' inventory management systems, but the descriptions are very general in nature.  For example, the specification describes an electronic data interchange connection, which is "to a proprietary retailer inventory system **212**.  Thus, the retailer computer **16** is configured to query and retrieve information from the retailer inventory system **212** regarding the exact products in the retailer inventory system **212**."  '830 patent, col. 11, ll. 48-52.  <u>See also</u> <u>id.</u>, col. 15, ll. 41-47 ("The award database **204** that is created by participation by the retailer is also connected via an electronic data interchange **126** to the retailer's current inventory according to inventory numbers, such as SKUs, type of inventory, or the like."); col. 39, ll. 18-24 ("The award database

**204** may also be built by a connection, through an electronic interchange connection **126** custom interface, to the retailer's propriety inventory system **212**. That is, the retailer may permit the HTTP server **188** to query the retailer's inventory system **212** to determine merchandise available for incentive programs, locations of merchandise, or other information.").

Even assuming the claims were construed to incorporate some or all of the detail set forth in passages of the specification such as the ones quoted above, the level of detail in those passages, which is typical of the specification, adds little to the specificity of the claims. Thus the Court concludes that, as in <u>Accenture</u>, the level of detail in the specification does not transform the abstract concept set forth in the claims into a patent-eligible system or method.

### 4. Kroy's Evidence Regarding Patentability

In its opposition to Safeway's motion for summary judgment, Kroy relies heavily on the declaration of its expert, Robert Sherwood. In his declaration, Mr. Sherwood stated that

> the invention provides a fully integrated system for creating, distributing and automating the fulfillment of awards in personalized consumer incentive programs. The system[] permits sponsors to create and target specific awards to specific consumers geographically and based on consumer demographics and psychographics, and allows the sponsor to control award fulfillment conditions in an automated fashion that reduces costs and increases convenience to the consumer. A host system coordinates the selection and targeting of awards in a manner synchronized with retail inventory information about available awards and products associated with awards. By providing a system that integrates incentive program creation and execution with other retail systems in this manner, the invention provides greater flexibility to program sponsors and improves the effectiveness of their promotions while reducing cost. Sponsors can quickly design and roll out promotions directly responsive to business conditions, while consumers receive promotions that are more relevant to their needs and interests. None of the prior approaches offered the unique combination of features and benefits recited in the patent claims.

Dkt. No. 151-4, at 10-11.

Mr. Sherwood added that in his view the claims "recite a system and methods that require specialized software and hardware working together in a customized retail business systems environment" and that in the system and method of the invention, the "computers coordinate and systematize the workings of multiple specialized computers, notably including an inventory management system."  Dkt. No. 151-4, at 11.  Discussing the benefits of the '830 patent, Mr. Sherwood stated that it "permits sponsors to build incentive programs easily and efficiently, and provides for convenient tracking of participation, and convenient, automated award fulfillment." Id. at 12.

In support of his assertion that the '830 patent claims "recite systems and methods to achieve results that were not available before the Kroy invention," Mr. Sherwood stated that the claims provide for "an incentive program integrated with retail inventory management systems," which allow sponsors "to align incentive promotions with specific marketing strategies and to design specific promotions for the right products targeted to the right consumers in the right locations."  Dkt. No. 151-4, at 13.  Integration with an inventory management system, he stated, "makes Kroy's specific system for implementing an incentive program less costly, a more effective marketing tool, more logistically manageable and more aligned in real time with changing business circumstances."  Id. at 13-14.

Contrary to Safeway's submission, Mr. Sherwood contended that the methods and system of the Kroy invention could not be performed by humans without the aid of computers.  He stated that "the coordination of the incentive program with up-to-date information about current inventory conditions would not be possible to achieve through manual processes or using a

pencil and paper, or through any other system and method available before the Kroy invention." Dkt. No. 151-4, at 14.

There are several problems with Mr. Sherwood's declaration. Although he referred to "specialized software and hardware working together in a customized retail business systems environment," he pointed to nothing in the claims or the specification that identifies any novel computer technology or function. The computer systems to which he referred are "specialized" only because they are dedicated to the specialized purpose of operating an incentive system that is connected to providers' inventory management systems, and because they provide for a sponsor to select awards based on data regarding consumer characteristics; these computer systems are not "specialized" in the sense that they improve computer technology or technology used in any other field. If operating the claimed incentive system is an abstract idea, Mr. Sherwood's references to the "specialized software and hardware" that implement that idea add nothing that would convert that abstract idea into a patentable invention.

Little in Mr. Sherwood's declaration directly addresses whether the idea of an incentive system connected to an inventory management system and channeled to customers with particular characteristics constitutes an abstract idea. Instead, the declaration focuses on asserting that the claimed incentive system requires specialized programming, offers certain efficiencies to users, and is not found in the prior art.

In particular, Mr. Sherwood's declaration describes the benefits of integrating an inventory management system with an incentive program, which allows the sponsor of an incentive program "to align incentive promotions with specific marketing strategies and to design specific promotions for the right products targeted to the right inventory." Dkt. No 151-4,

at 13. It does not, however, address the question whether the idea of linking an incentive program to an inventory management system is an abstract idea that is not entitled to patenting.

At its most basic level (which is all that is addressed by the claim language), the requirement that the incentive program be "in communication with an inventory management system" could be satisfied simply by providing some means of determining that a sufficient quantity of awards is available to winning customers. Such a basic step as ensuring that awards are available for winners, like the additional steps in <u>Ultramercial</u>, adds nothing of consequence to the basic idea of an incentive award program.

Mr. Sherwood also stated, more generally, that the '830 patent "permits sponsors to build incentive programs easily and efficiently, and provides for convenient tracking of participation, and convenient, automated award fulfillment." Dkt. No. 151-4, at 12. But those functions simply describe the advantages provided by the use of computers in performing tasks that otherwise would have to be performed manually. If there is no "inventive concept" in the tasks of tracking the participation of consumers and providing fulfillment of awards—and there is not—there is no inventive concept in performing those tasks efficiently by computer.

On the same theme, Mr. Sherwood added that the '830 patent "allows sponsoring companies to offer incentive programs involving multiple award providers, to target specific awards to consumers on a personalized basis, to control the manner and geographic locations at which awards may be redeemed, and to automate and manage the entire process from award creation to redemption." But again, those functions are quotidian tasks; they may be performed more efficiently in a computerized system than by humans acting without computerized aids, but

46

they do not involve the introduction of any "inventive concept" into the otherwise abstract idea of providing an incentive award program targeted at consumers.

### 5. Kroy's Arguments Regarding the Complexity and Specificity of the Invention

In the briefing, Kroy characterizes the '830 patent as "claim[ing] highly sophisticated systems and methods with considerable specificity" and refers to the "complex role played by computers in the '830 systems," Dkt. No. 165, at 4; see also Dkt. No. 151, at 12 ("Kroy has transformed basic building blocks into a highly sophisticated system and methods which solve problems and accomplish goals well beyond rudimentary incentive programs."). Those characterizations vastly overstate the case. Although the specification is detailed, the technology described in the specification involves very conventional applications of well-known computer functions. More significantly, the claims do not recite "highly sophisticated systems and methods with considerable specificity." Instead, as discussed above, the claims are quite general in nature and recite, with little elaboration, a computerized incentive award system "in communication with" the inventory management systems of two or more providers. The only additional limitations, set forth in highly general terms, are that the system allows the sponsor to select the award, which is tailored to the preferences of consumers, and that the system allows the sponsor to select the location where the award will be redeemed.

Contrary to the assertions in Kroy's briefs, those additional limitations add little of substance to the claims. Those limitations could be satisfied, for example, by a greengrocer who decided to offer incentives to customers who have expressed a taste for a particular item in the past. Notwithstanding the abstract terms used in the claims, the extra limitations beyond the use of a computer would be satisfied if the greengrocer detected a surplus of avocados on his shelf,

decided to reduce his inventory of avocados, and offered avocado aficionados a free avocado for every three avocados they buy at the store.  Thus, despite Kroy's contentions about "the complex role played by computers in the '830 systems," there is very little complexity in the basic system recited in claims.  Applying the invention in a complex marketing environment with hundreds of awards, thousands of customers, and sophisticated inventory management systems could, of course, become complex, but that is complexity in the application, not complexity in the invention.  The basic invention, as expressed in the claims, remains very simple and can fairly be described as embodying nothing more than an abstract idea implemented on a generic computer.

In its briefs, Kroy makes several attempts to show that the invention is more complex than it appears from the claims.  For example, Kroy argues that the claims "do not merely provide awards.  They utilize a data structure recited as a 'sponsor-selected award unit item,' which was construed to require 'a specific award item and all of the corresponding identifying or classifying information selected by a sponsor.' . . .  This is a specific way in which the invention implements sponsor-controlled award allocation, tailoring and fulfillment."  Dkt. No. 165, at 5.

Upon close examination, it is apparent that the complexity to which Kroy refers resides more in the terminology used in the patent than in the underlying concepts.   While the nomenclature of the patent can be difficult to parse—as, for example, in attempting to distinguish between awards, award items, and award unit items—the concepts are simple.  The specification makes clear that the term "award unit item" refers to the items in the award database, which may include not only the award, but also information such as the method of fulfillment, the identification number of the item, a description of the item and the number of items available.  '830 patent, col. 41, ll. 11-22.  That aspect of the claim language simply allows for the inclusion

of relevant information regarding the award in the database and does not alter the nature of the claims in a way that makes them patentable.

Kroy further asserts that the claims of the '830 patent "provide a mechanism for tracking inventory data associated with retailers or other providers who participate in the sponsor's incentive programs, and for coupling this information with consumers' preferences for determining award allocations and fulfillment locations."  Dkt. No. 185, at 10; Dkt. No. 151, at 7.  In fact, that is not at all what the claims do.  The claims simply recite, in very general terms, that the incentive program on the host computer is "in communication with an inventory management system associated with each of the providers."  The claims recite no "mechanism" for tracking inventory data.  Nor do the claims provide any mechanism "for coupling this information with consumers' preferences for determining award allocations and fulfillment locations," as Kroy contends.  The claims simply recite that the computer code in the program is "adapted to provide a sponsor-selected specific award unit item" that is "tailored to demographic and psychographic preferences of a sponsor-selected consumer user," and is "adapted to provide a sponsor-selected geographic location for fulfillment."  Those are not recitations of mechanisms.  Those are recitations of objectives.  In that regard, the claims are effectively functional in nature, and would read on any method of achieving those objectives with the use of a computer.  As such, the claims have the vice of undue preemptive force that is typically associated with claims to abstract ideas.

In Loyalty Conversion Systems Corp. v. American Airlines, Inc., No. 2:13-cv-655, 2014 WL 4364848 (E.D. Tex. Sept. 3, 2014), this Court noted that the claims in certain types of business method patents have certain features in common that have led the courts to finding

those patents invalid under section 101.   First, "they recite methods for performing a commonplace business function . . . typically by using a computer system or computer components to perform those methods."   Second, they are aspirational in nature in that they recite a business function, but not any novel manner of performing that function "other than referring to the use of routine operations performed by a specially programmed computer." Third, the recitations relating to the use of a computer do not include any inventive measures that "purport to improve the functioning of the computer itself."   Loyalty Conversion, 2014 WL 4364848, at 13.  This Court added that such patents do not contain an "inventive concept," but instead "simply describe a problem, announce purely functional steps that purport to solve the problem, and recite standard computer operations to perform some of those steps."  Id.

In this case, as in many business method patent cases, the claims are broad and essentially functional in nature.    The claims are not limited to the particular means by which the various recited functions are performed and would read on virtually any computerized method of performing those functions.   In that sense, the '830 patent, like other similar business method patents, has the potential to foreclose future innovation disproportionately "relative to the contribution of the inventor."  Mayo, 132 S. Ct. at 1303.

To be sure, unlike some cases involving abstract ideas, the specification of the '830 patent is detailed, a point that Kroy heavily relies on in its effort to distinguish the paradigmatic business method cases.   As discussed above, however, the specification consists mainly of a detailed description of commonplace computer components and operations that can be employed to perform the tasks of constructing the databases necessary to run the computerized incentive award programs and to make those programs available to the users and to consumers.  In any

50

event, the specification does not limit the breadth of the claims, which would read on any computerized system that performed the recited functions.   The length and detail of the specification of the '830 patent does not convert the claims of that patent into patentable subject matter.

Because the undisputed facts show that the asserted claims are ineligible for patenting under 35 U.S.C. § 101, the Court grants the defendant's motion for summary judgment of invalidity as to claims 1, 19, and 20-25 of the '830 patent.

It is so ORDERED.

SIGNED this 29th day of May, 2015.



WILLIAM C. BRYSON
UNITED STATES CIRCUIT JUDGE